EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Arturo Guzmán Vargas<br><br>Demandante<br><br>v.<br><br>Hon. Sila M. Calderón, et al.<br><br>Demandados | Certiorari<br><br>2005 TSPR 33<br><br>163 DPR \_\_\_\_ |

Número del Caso: CT-2003-2

Fecha: 23 de marzo de 2005

United States District Court

District of Puerto Rico

Juez Ponente:

Hon. Carmen Consuelo Cerezo

Abogado de la Parte Demandada:

Lcdo. Fernando L. Gallardo Aramburu
Lcdo. Gerardo de Jesús Annoni

Oficina del Procurador General:

Lcda. Rosa Elena Pérez Agosto
Procuradora General Auxiliar

Lcda. Janitza Alsina Rivera
Procuradora General Auxiliar

Materia: Certificación Interjurisdiccional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Arturo Guzmán Vargas

    Demandante

       v.                      CT-2003-002    Certificación

Hon. Sila M. Calderón, *et al*.

    Demandados

PER CURIAM

San Juan, Puerto Rico, a 23 de marzo de 2005.

Mediante el proceso de certificación interjurisdiccional la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico nos solicita que determinemos si el requisito de justa causa para la destitución por el(la) Gobernador(a) de un miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública, contemplado en la ley orgánica de la referida corporación [1], infringe las facultades constitucionales que tiene el (la) Gobernador (a)

---

[1] Véase, Art. 3 de la Ley Núm. 216 de 12 de septiembre de 1996, 27 L.P.R.A. sec. 501 *et seq*.

de remover funcionarios públicos nombrados por éste(a).

Al disponer de este caso, aprovecharemos la oportunidad

para delimitar los nuevos contornos de la certificación

interjurisdiccional a la luz de la Ley de la Judicatura

de 2003, *supra*. Veamos.

I

Los hechos medulares no están en controversia. Allá

para el año 2001, mediante la Orden Ejecutiva #OE-2001-

03, la entonces Gobernadora del Estado Libre Asociado de

Puerto Rico, Hon. Sila M. Calderón (en adelante la

Gobernadora de Puerto Rico), requirió que cualquier

nombramiento y/o contrato que se fuera a otorgar por

alguna dependencia gubernamental contase con la

autorización por escrito del entonces Secretario de la

Gobernación, Hon. César Miranda (en adelante Secretario

de la Gobernación).[2] Esta orden, dirigida a estabilizar

fiscalmente al gobierno, le sería de aplicación a todas

las agencias, juntas, cuerpos, comisiones, tribunales

---

[2] Esta orden fue emitida al amparo del Art. VI, Sec. 7, de la Constitución del Estado Libre Asociado de Puerto Rico. Este, en lo pertinente, establece que:

> Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

examinadores, divisiones y corporaciones públicas adscritas al gobierno, con expresa exclusión de la Universidad de Puerto Rico.

Recibida la Orden Ejecutiva, el Sr. Arturo Guzmán Vargas, entonces Presidente de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública, convocó a una conferencia de prensa donde anunció al país que la corporación que presidía no estaba llamada a cumplir con la referida orden y, por lo tanto, se otorgarían todos los contratos pendientes sin la debida autorización. Enterada de ello, la Gobernadora de Puerto Rico destituyó, por insubordinación, al señor Guzmán Vargas de su posición como miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública.

Eventualmente, el señor Guzmán Vargas presentó ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico una demanda por violación a sus derechos civiles en contra de varias personas, entre ellas, la Gobernadora de Puerto Rico. En lo pertinente, sostuvo que su destitución fue sin justa causa en contravención a lo dispuesto en el Art. 3 de la Ley Núm. 216 de 12 de septiembre de 1996, 27 L.P.R.A. sec. 501 *et seq.*, mejor conocida como la Ley de la Corporación de Puerto Rico para la Difusión Pública (en adelante Ley

Núm. 216).[3] Oportunamente, los demandados solicitaron la desestimación de la demanda. Alegaron que el Art. 3 de la Ley Núm. 216, *supra,* era contrario al principio de separación de poderes y limitaba las facultades constitucionales que tiene el(la) Gobernador(a) de nombrar y remover a los funcionarios públicos con el fin de velar por el fiel cumplimiento de las leyes que es llamado(a) a poner en vigor.

Trabada la controversia, y al amparo de lo dispuesto en el Art. 3.002 (f) de la Ley de la Judicatura de 2003, Ley Núm. 201 de 22 de agosto del 2003 y de la Regla 25(a) del Reglamento de este Tribunal, 4 L.P.R.A Ap. XXI-A, la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, por voz de la Hon. Carmen Consuelo Vargas de Cerezo, nos solicitó que expidiésemos un recurso de certificación a los únicos fines de determinar la constitucionalidad del Art. 3 de la Ley Núm. 216, *supra*. Acordamos expedir el auto de certificación solicitado. Oportunamente las partes presentaron sus respectivos alegatos. El Procurador General de Puerto Rico, en calidad de Amigo de la Corte, compareció ante nos y reiteró la alegación de los demandados respecto a la limitación que impone el Art. 3 de la Ley Núm. 216, *supra,* a los poderes

---

[3] En lo pertinente, el referido artículo establece que los miembros de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública que no sean miembros *ex officio* "sólo podrán ser removidos por justa causa."

constitucionales del(la) Gobernador(a). Con el beneficio de la comparecencia de todas las partes, resolvemos.

## II

En primera instancia, consideramos útil exponer los aspectos esenciales del procedimiento de certificación, para luego considerar si la pregunta certificada cumple con dichos requisitos de forma tal que nos permita adquirir jurisdicción en el caso y de este modo contestarla. Veamos.

En términos generales, el procedimiento de certificación interjurisdiccional es el instrumento procesal adecuado que permite a un tribunal someter, para una contestación definitiva, a otro tribunal de jurisdicción distinta, preguntas sobre cuestiones dudosas que se refieren al derecho de esa jurisdicción. Las contestaciones a esas preguntas obligan en cualquier procedimiento judicial ulterior entre las mismas, bajo la doctrina de cosa juzgada:

> La certificación es el medio más directo, rápido y económico para que la Corte federal obtenga una interpretación autorizada sobre el derecho estatal. En virtud de este procedimiento las cuestiones dudosas o no resueltas en el derecho estatal son transferidas directamente al foro de mayor jerarquía del estado mediante la certificación por la Corte federal de preguntas específicas para una cuestión definitiva que obligue a las partes. De otra manera, al abstenerse la Corte federal los litigantes tendrían que iniciar un nuevo pleito en los tribunales estatales siguiendo todo el trámite judicial, usualmente lento y costoso, hasta obtener una interpretación final y firme sobre el derecho estatal. *Pan*

*Ame.   Comp.  Corp.  v.  Data  Gen.  Corp.*, 112
D.P.R. 780, 785 (1982).

Antes de la aprobación de la Ley de la Judicatura de 2003, *supra*, en Puerto Rico la certificación interjurisdiccional solo se reconocía expresamente en la Regla 53.1 de Procedimiento Civil, *supra*, y la Regla 25 del Reglamento de este Tribunal, *supra*. Al amparo de estas reglas, establecimos que la facultad de este Tribunal para conocer los asuntos que le son certificados por una corte federal era de carácter discrecional y no mandatorio. Regla 25 del Reglamento del Tribunal Supremo, *supra*; Pan Ame. Comp. Corp. v. Data Gen. Corp., *supra*; Dapena Thompson v. Colberg Ramírez, 115 D.P.R. 650 (1984).

Ambas reglas exigían como requisito para que procediese una certificación el que: (1) la controversia involucrase cuestiones de derecho puertorriqueño; (2) dichas cuestiones debían determinar o definir el resultado del caso; (3) no existiesen precedentes claros en la jurisprudencia de este Tribunal, y (4) el que se hiciese relación de todos los hechos relevantes a dichas interrogantes que demostrasen claramente la naturaleza de la controversia de la cual surgen las preguntas. Las partes, además, pueden someter alegatos y solicitar vista oral. Pan Ame. Comp. Corp. v. Data Gen. Corp., *supra*, pág. 788.

Sin embargo, las mencionadas disposiciones legales restringían considerablemente nuestra intervención en los asuntos a certificarse cuando: 1) la cuestión planteada fuese una mixta por incluir aspectos de derecho federal, y/o de derecho estatal del tribunal solicitante, y aspectos del derecho local de Puerto Rico, que debiesen ser resuelta por el tribunal solicitante o 2) cuando la cuestión planteada en el procedimiento de certificación fuese la validez de un estatuto de Puerto Rico, impugnado bajo la Constitución del Estado Libre Asociado de Puerto Rico, la certificación de la pregunta sólo procede si la disposición constitucional local no tiene equivalente en la Constitución federal.

Ahora bien, con la aprobación de la nueva Ley de la Judicatura de 2003, *supra*, esas limitaciones quedaron atrás. El Art. 3.002 de la referida disposición legal, *supra*, amplió sustancialmente la facultad de este Tribunal para acoger aquellos recursos certificados ante nos por los tribunales de los Estados Unidos de América. En lo pertinente, estableció que el Tribunal Supremo:

> Mediante auto de certificación, podrá conocer de cualquier asunto que le fuere certificado por el Tribunal Supremo de los Estados Unidos de América, un Tribunal de Circuito de Apelaciones de Estados Unidos de América, un Tribunal de Distrito de los Estados Unidos de América o el más alto tribunal apelativo de cualquiera de los estados de los Estados Unidos de América, cuando así lo solicite cualquiera de dichos tribunales, de existir ante el tribunal

> solicitante cualquier asunto judicial en el que estén implicados cuestiones de derecho puertorriqueño que puedan determinar el resultado del mismo y respecto al cual, en la opinión del tribunal solicitante, no existan precedentes claros en la jurisprudencia de este Tribunal.

De esta forma, y dejando a un lado los requisitos que impedían que este Tribunal interviniese en cierto recursos de certificación interjurisdiccional, se flexibiliza la normativa que hasta entonces regía el referido procedimiento y se facilita que los tribunales federales puedan someter, para una contestación definitiva de este Tribunal, preguntas sobre cuestiones dudosas que se refieren al derecho puertorriqueño. Además, se preserva y respeta, _verdaderamente_, "la función prístina de las cortes estatales de interpretar y formular el derecho de [sus respectivos] estados", contribuyendo, además, a que se alivien en buena parte las tensiones inherentes al sistema federalista. Pan Ame. Comp. Corp. v. Data Gen. Corp., _supra_ a la pág. 783-785.

En el caso de autos, el recurso de certificación nos fue presentado luego de una orden emitida por la Hon. Carmen Consuelo Vargas de Cerezo, Juez de la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico. Este, en primer lugar, involucra asuntos judiciales en el que están implicadas cuestiones de estricto derecho puertorriqueño, como lo es la facultad que tiene el(la) Gobernador(a) de Puerto Rico, al amparo

de la Constitución del Estado Libre Asociado de Puerto Rico, de nuestras leyes y reglamentos, para remover a funcionarios públicos nombrados por sí o por su predecesor por un término específico de tiempo; en segundo lugar, no existen precedentes claros que lleven a una correcta disposición del asunto y; en tercer lugar, la decisión emitida por este foro puede determinar el resultado del pleito ante el foro federal. Considerando ello, además de la enorme importancia del asunto y el alto interés público de que este Tribunal intervenga directamente en la interpretación del derecho puertorriqueño, procede la certificación.

III

De entrada, es menester reconocer, que el alcance del poder de del(la) Gobernador(a) de Puerto Rico de destituir funcionarios públicos de sus puestos, así como el poder de la Asamblea Legislativa de imponer restricciones a dicha facultad, son, indudablemente, asuntos noveles en nuestra jurisdicción. Si bien la Constitución del Estado Libre Asociado de Puerto Rico, en su Art. IV, sección 4, dispone que una de las atribuciones del Primer Ejecutivo es: "[n]ombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado", nada expresa sobre las facultades de éste para destituirlos y mucho menos sobre el poder de la Rama Legislativa de limitar el

poder ejecutivo al crear los departamentos y agencias ejecutivas. Las discusiones en la Asamblea Constituyente sobre el alcance de ésta disposición constitucional tampoco abundan sobre el particular.

Sin embargo, obran en el <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>,[4] expresiones **<u>claras y contundentes</u>** en torno a la facultad de la Asamblea Legislativa de imponer restricciones al poder del(la) Gobernador(a) para destituir funcionarios nombrados por éste. Aun cuando tales expresiones surgen dentro del marco de las facultades delegadas a la Rama Legislativa, entendemos que dichos pronunciamientos son particularmente pertinentes a la controversia de autos donde estamos llamados a resolver si es válida una limitación impuesta por la Asamblea legislativa a la facultad del poder Ejecutivo de nombrar y destituir sus funcionarios.

Así pues, cabe mencionar que el historial de la Asamblea Constituyente refleja que, en momentos en que se discutía  el alcance de los poderes delegados a la Rama Legislativa, se debatió extensamente sobre este extremo. De particular importancia son las expresiones vertidas por el delegado Víctor Gutiérrez Franqui en momentos en que éste proponía una enmienda a la entonces

---

[4] *Véase*, 3 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, Ed. Lexis-Nexis, 2003, pág. 2269-2271.

Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, hoy sec. 16. La referida sección, según propuesta en el *Informe de la Comisión de la Rama Legislativa*,[5] al momento de ser considerada por los miembros de la Asamblea Constituyente, estaba redactada de la siguiente manera:

> "La Asamblea Legislativa tendrá plena facultad para crear departamentos ejecutivos y consolidar y reorganizar los mismos, y para determinar por ley los poderes, las funciones, los deberes y el término de servicio de los secretarios de gobierno a cargo de los departamentos, pero el término de servicio de ningún secretario de gobierno será mayor que el del Gobernador que lo nombró."

A juicio del delegado Gutiérrez Franqui "[a]l examinar cuidadosamente esta disposición, [le] asaltó la duda de si era facultad propia de la Asamblea Legislativa, en un gobierno de sistema republicano, y en donde la Asamblea Legislativa tiene la facultad de aprobar leyes por encima del veto del Gobernador, que el poder legislativo pudiera tener la facultad de variar a su antojo el término de duración de los cargos de secretarios de gobierno; o de variar a su antojo la especificación de sus funciones. Dicho de otro modo, a la luz de los estudios realizado por éste, le pareció poco probable que la Asamblea Legislativa de Puerto Rico pudiera establecer algún tipo de limitación al poder de

---

[5] *Véase*, 4 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico,</u> Ed. Lexis-Nexis, 2003, pág. 2577-2590.

nombramiento del(la) Gobernador(a) cuando se tratase de funcionarios de confianza como lo son los "secretarios de gobierno".

Así pues, en aras de eliminar de esta sección, entre otras cosas, el lenguaje que establecía que la Asamblea Legislativa de Puerto Rico tendría la facultad "para determinar las funciones, deberes y el término de servicios de los secretarios de gobierno" -- y tomando como base los frutos de la experiencia y del estudio de la Constitución de los Estados Unidos de América, de los estados de la unión y de aquellos países en que los principios democráticos dan pauta de acción al desarrollo de funciones públicas-- el delegado Gutiérrez Franqui propuso que, en cuanto a este asunto, se adoptara la interpretación dispuesta, hasta ese momento en la Constitución de los Estados Unidos, con la correspondiente interpretación judicial. Expresó Gutiérrez Franqui:

> Señor Presidente y compañeros delegados: El propósito de esta enmienda que tengo ahora el honor de proponerles, es sencillamente que adoptemos la manera de bregar con el asunto que establece la Constitución de los Estados Unidos de América, [con la correspondiente interpretación judicial]

> En otras palabras: Que meramente consignemos la facultad del Gobernador para nombrar los secretarios de gobierno. Dejemos establecido también en otra parte de la constitución, que los secretarios del gobierno asistirán al Gobernador en el desempeño y ejercicio del poder ejecutivo. Y que, en cuanto a los departamentos de gobierno, meramente consignemos la facultad de la Asamblea

legislativa para crear, consolidar, reorganizar y determinar las funciones de los departamentos. Y que, nada digamos en cuanto al poder para determinar las funciones y el término de duración de los cargos de los secretarios propiamente dichos, adoptando así la doctrina de la Constitución de los Estados Unidos... (Bastardillas nuestras.)

Luego de la exposición de rigor, la enmienda sometida -- que buscaba eliminar del texto de la Sec. 10 aquella parte que establecía que la Asamblea Legislativa de Puerto Rico tendría la facultad "para determinar las funciones, deberes y el término de servicios de los secretarios de gobierno"-- logró conseguir 54 votos de los delegados en la Asamblea Constituyente, por lo que la misma quedó aprobada.

Como consecuencia de esa enmienda, la referida sección de nuestra Constitución quedó finalmente aprobada con el siguiente lenguaje:

La Asamblea Legislativa tendrá facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones.

La adopción de esta enmienda reflejó la intención de los constituyentes de incorporar en nuestra jurisdicción criterios similares a los adoptados en la jurisdicción federal en cuanto al alcance del poder de la Asamblea Legislativa para intervenir, como sucede en el caso de autos, con los poderes delegados a la Rama Ejecutiva.

Aclarado ello, repasamos los principios estatutarios y jurisprudenciales que gobiernan el asunto en la referida jurisdicción.

IV

A.

Como es sabido, el Art. II., Secs. 1, 2 y 3 de la Constitución de los Estados Unidos de América le confiere a su Presidente el poder de nombrar, con el consejo y consentimiento del Senado, a los embajadores, ministros, cónsules públicos, jueces del Tribunal Supremo y todos aquellos funcionarios de los Estados Unidos cuyos cargos se establezcan por ley, y cuyos nombramientos dicha Constitución no prescriba. Todos éstos tienen la obligación de asistirle en su función principal de hacer cumplir las leyes.[6] Sin embargo, y de

---

[6]    En lo pertinente, el Art. II, sección 1, 2 y 3 de la Constitución de los Estados Unidos de América establece que:

**Sección 1.**

El poder ejecutivo residirá en el Presidente de los Estados Unidos de América.

**Sección 2.**

Con el consejo y consentimiento del Senado tendrá poder para celebrar tratados, siempre que en ellos concurran las dos terceras partes de los senadores presentes. **Asimismo, con el consejo y consentimiento del Senado, nombrará embajadores, otros ministros y cónsules públicos, los jueces del Tribunal Supremo y todos los demás funcionarios de los Estados Unidos cuyos cargos se establezcan por ley y cuyos nombramientos esta Constitución no prescriba. Pero el**

forma similar a lo que ocurre en nuestra Constitución, el Art. II de la Constitución de los Estados Unidos de América no establece expresamente la facultad, si alguna, que puede tener el Presidente de la nación para destituir a los funcionarios nombrados por éste. El residenciamiento, la única forma de destitución de funcionarios públicos dispuesta en la referida Constitución, sólo le es de aplicación al Presidente, al Vicepresidente y a todos los funcionarios civiles de los Estados Unidos.[7] Ha sido pues el Tribunal Supremo de los

---

**Congreso podrá por ley, confiar el nombramiento de aquellos funcionarios subalternos que creyere prudente, al presidente únicamente, a los tribunales de justicia o a los jefes de departamento.**(Énfasis suplido.)

**Sección 3**

El presidente informará periódicamente al Congreso sobre el estado de la Unión y le recomendará aquellas medidas que él estime necesarias y convenientes. Podrá, en ocasiones extraordinarias, convocar a ambas Cámaras o a cualquiera de ellas; y en caso de que las Cámaras no estuvieren de acuerdo con relación a la fecha para recesar, el presidente podrá fijarla según lo juzgue conveniente. El presidente recibirá a los embajadores y demás ministros públicos. **Velará por el fiel cumplimiento de las leyes y extenderá los nombramientos de todos los funcionarios de los Estados Unidos.**(Énfasis suplido.)

[7] En lo relativo al proceso de residenciamiento, el Art. II, sec. 4 de la Constitución de los Estados Unidos de América establece que:

El presidente, el vicepresidente y todos los funcionarios civiles de los Estados Unidos

Estados Unidos quien por la vía jurisprudencial ha atendido esta laguna en ley, siendo el caso de <u>Myers v. United States</u>, 227 U.S. 52 (1926), una de las primeras decisiones en tratar este complejo asunto. Véase, Laurence H. Tribe, *American Constitutional Law*, Ed.Foundation Press, 2000, pág. 703-717.

En <u>Myers v. United States</u>, *supra,* el Tribunal determinó que el Congreso no podía privar al Presidente de los Estados Unidos de su poder para destituir un funcionario de la Rama Ejecutiva. [8] El poder de destitución, resolvió el Tribunal, está inmerso en el poder de nombramiento conferido al Presidente por la Constitución de los Estados Unidos de América. En virtud de ello, éste tenía la facultad exclusiva y absoluta para separar a los funcionarios por él nombrados independientemente de que, como sucede en el caso de autos, la ley que crease el cargo le fijase un término de duración o estableciese las causales para la

serán destituidos de sus cargos mediante procedimiento de residencia, previa acusación y convictos que fueren de traición, cohecho u otros delitos graves y menos graves.

[8] En este caso el Presidente de los Estados Unidos despidió a un Administrador de Correos antes de habérsele vencido el termino de cuatro (4) años para el cual fue nombrado a dicha posición. La Ley que creaba el cargo establecía que los administradores de correos sólo podían ser removidos por el Presidente de los Estados Unidos con el consejo y consentimiento del Senado. Este último requisito fue declarado inválido.

destitución de dichos funcionarios. Este amplio poder, a juicio del Tribunal, concretizaba la responsabilidad del Presidente de la nación de velar porque todas las leyes fuesen cumplidas; deber, que como mencionamos, le impone el Art. II, Sec. 3, de la Constitución de los Estados Unidos de América.

Aproximadamente una década más tarde, en Humphrey's Executor v. United States, 295 U.S. 602 (1935) [9] se limitó substancialmente la norma establecida en Myers v. United States, *supra*. **En esta ocasión se interpretó que la facultad del Presidente de destituir funcionarios nombrados por éste podía ser restringida cuando se tratase de funcionarios revestidos con facultades cuasi-legislativas y/o cuasi judiciales.** A juicio del Tribunal, este tipo de funcionario requiere cierto grado de independencia, con respecto a la Rama Ejecutiva, para llevar a cabo eficientemente las tareas que le fueron asignadas. En lo pertinente, señaló el tribunal:

> We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officer of the character of those just named. **The authority of Congress, in creative quasi legislative or quasi judicial**

[9] En este caso el Presidente de los Estados Unidos destituyó a un miembro de la "Federal Trade Comission", comisión investida de poderes cuasi-legislativos y cuasi-judiciales, al alegar la necesidad de que la Comisión estuviera integrada por personas de su confianza. En la ley habilitadora de la Comisión, el Congreso había dispuesto que sus miembros serían nombrados a término y que sólo podían ser destituidos por ineficiencia, negligencia o ilegalidades en el manejo de su oficina

**agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime.** For it is quite evident that one who holds his office only during the pleasure of another cannot depended upon to maintain an attitude of independence against the latter's will. 295 U.S. a la pág. 629. (Énfasis suplido.)

La doctrina elaborada en <u>Humphrey's Executor v. United States</u>, según discutida anteriormente, fue sostenida, años más tarde, en <u>Wiener v. United States</u>, 357 U.S. 349 (1958). [10] El Tribunal resumió de la siguiente manera lo que constituiría el criterio rector en este tipo de caso:

**Thus, the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Comission.** What were the duties that Congress confined to this Comission? And can the inference fairly be drawn from the failure of Congress to provide for removal that these Commissioners were to remain in office at will of the President? Id a la pág. 357 U.S. a las págs. 353-354 (Énfasis suplido.)

---

[10] En este caso el Presidente de los Estados Unidos, en aras de reclutar personal de su absoluta confianza, destituyó a un miembro de la Comisión de Guerra. Dicha comisión fue creada para adjudicar solicitudes de compensación presentada por individuos u organizaciones que hubieran sufrido daños durante la Segunda Guerra Mundial. La ley habilitadora de la Comisión establecía que el término de incumbencia de los comisionados terminaría cuando concluyese su encomienda. Sin embargo, nada se dispuso en cuanto a la destitución de sus miembros.

El alcance del poder de destitución del Presidente fue considerado nuevamente por el Tribunal Supremo de los Estados Unidos en Morrison v. Olson, 487 U.S. 654 (1988).[11] Similar a lo resuelto en Humphrey's Executor v. United States, *supra*, y la secuela de casos que le citan, dicho foro señaló que el análisis realizado por los tribunales al momento de decidir si el Presidente tiene facultad para destituir a un funcionario nombrado por éste no puede limitarse al tipo de función que realiza el funcionario, es decir, puramente ejecutivas, cuasi-legislativas o cuasi-judiciales. **Aunque dicho análisis es de por sí esencial al momento de decidir si el Presidente tiene o no la facultad de destituir al funcionario en cuestión, es indispensable, además, evaluar la forma en que las restricciones impuestas al poder de destitución del Presidente inciden en la facultad de éste de cumplir y hacer cumplir las leyes**. Es imprescindible, pues, evaluar el grado de independencia que requiere, con respecto a la Rama Ejecutiva, el funcionario en cuestión para ejecutar eficientemente las tareas que le fueron delegadas. En lo pertinente, dicho foro señaló:

> We undoubtedly did rely on terms "quasi-legislative" and "quasi-judicial" to distinguish the officials involved in

---

[11] En este caso se cuestionó la limitación impuesta por un estatuto al poder de destitución del Presidente, otorgándole dicho poder al Secretario de Justicia Federal.

*Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a "good-cause" type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive". **The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II...**

[. . .]

**[B]ut the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty and the functions of the officials in question must be analyzed in that light.** 487 U.S. a las págs. 689-691. (Énfasis suplido)

### B.

En virtud de lo anterior, y cónsono con el mandato que nos dieron los miembros de la Asamblea Constituyente en momentos en que se debatía el alcance del poder de remoción del(la) Gobernador(a), de adoptar la interpretación que se le ha dado al asunto en la jurisdicción federal, es forzoso concluir, como punto de partida para nuestro análisis, que cualquier determinación relacionada a la constitucionalidad de una limitación estatutaria al poder de nombramiento y/o destitución del gobernante requiere un análisis caso a caso en el cual es imprescindible identificar si el

funcionario realiza funciones de naturaleza "puramente ejecutiva", cuasi-legislativa o cuasi-judicial. Cuando se trate de un funcionario con facultades "puramente ejecutivas", la facultad de la Rama Legislativa para imponer requisitos para destituir a dicho funcionario es mínima debido a que se trata, en la mayoría de los casos, de funcionarios que colaboran directamente en la implantación de la política pública y en la ejecución de aquellas funciones asignadas por la Constitución a la Rama Ejecutiva.

El criterio principal para determinar la validez del estatuto consiste en que la limitación legislativa al poder de destitución del Gobernador(a) de Puerto Rico no interfiera en forma impermisible e irrazonable con su facultad constitucional de hacer cumplir y poner en vigor las leyes y de formular e implantar la política pública. El examen al estatuto exige que la limitación legislativa a dicha facultad no limite impermisiblemente los poderes de la Rama Ejecutiva ni lesione el balance que debe existir entre las ramas del gobierno.

Distinto es el caso de aquellos funcionarios que desempeñan tareas cuasi-legislativas y cuasi-judiciales. A este tipo de funcionario la Asamblea Legislativa puede garantizar un grado de independencia mayor, que le permita cumplir con sus funciones, libre de cualquier interferencia de otras ramas de gobierno. Por ende, en ese caso, cualquier restricción razonable al poder de

destitución del(la) Gobernador(a) sería válida, claro está, a menos que incida sobre la facultad del gobernante de cumplir con sus poderes constitucionales.

Tratándose el asunto ante nuestra consideración de un tipo de limitación al poder de destitución del(la) Gobernador(a), es precisamente a la luz de este marco jurídico que debemos atender las controversias de autos.

V

A.

En lo pertinente al asunto que nos ocupa, la ley orgánica de la Corporación de Puerto Rico para la Difusión Pública establece que la Junta de Directores de la referida corporación deberá estar integrada por el Secretario de Educación, el Presidente de la Universidad de Puerto Rico, el Director Ejecutivo del Instituto de Cultura Puertorriqueña y ocho (8) ciudadanos provenientes del sector privado en representación del interés público, quienes serán nombrados por el Gobernador con el consejo y consentimiento del Senado y por lo menos tres (3) deberán ser personas de comprobado interés, conocimiento y experiencia en educación, cultura, artes, ciencias o comunicaciones de radio y televisión. 29 L.P.R.A. sec. 503. Los nombramientos de los miembros de la Junta se harán por los siguientes términos: dos (2) miembros por seis (6) años; dos (2) miembros por cinco (5) años; dos (2) miembros por cuatro (4) años y dos (2) miembros por tres (3) años, y hasta

que sus sucesores sean nombrados y tomen posesión del cargo. Una vez concluya cada término el mismo será uno fijo de seis (6) años. **Según contemplado en la referida ley, los miembros de la Junta de Directores que no sean miembros *ex officio* sólo podrán ser removidos por justa causa**. 29 L.P.R.A. sec. 503.

Es precisamente el requerimiento de justa causa para la destitución por el(la) Gobernador(a) de un miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública, el que está en controversia. Tanto la Gobernadora del Estado Libre Asociado de Puerto Rico, como el Procurador General, entienden que dicha exigencia infringe los poderes y facultades constitucionales conferidas al(la) Gobernador(a) para nombrar, en la forma que se disponga por la Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. No les asiste la razón. Veamos porqué.

Como mencionamos anteriormente, la primera etapa del análisis que adoptó la Asamblea Constituyente requiere que examinemos la naturaleza de las funciones realizadas por los miembros de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública.

Así pues, una lectura de la ley habilitadora de la Corporación de Puerto Rico para la Difusión Pública, en particular de su Art.3, revela que nuestro legislador, de manera expresa, además de tareas administrativas,

delegó en los miembros de la Junta de Directores de dicha corporación la facultad cuasi-legislativa de: *"aprobar, enmendar y derogar aquellos reglamentos que estime necesarios o convenientes para llevar a cabo sus fines, propósitos y actividades".* Cónsono con lo que establece el Art. 4 de la mencionada disposición legal, tales reglamentos se aprobarían *"conforme a lo establecido en las secs. 2101 et seq. del Titulo 3, conocidas como la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico".* Dichas facultades son tan exclusivas de la Junta de Directores que el Art. 3 de la Ley Orgánica de la Corporación del Servicio Público establece que la Junta de Directores "podrá delegar en el Presidente [de la Corporación de Puerto Rico para la Difusión Pública] o en cualesquiera otros de sus funcionarios, empleados o agentes aquellos poderes y deberes que estime propios*, excepto la facultad de aprobar, enmendar y derogar reglamentos."*

A tenor con dichas facultades asignadas por ley, los miembros de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública han aprobado varios reglamentos de interés público, entre estos: Reglamento de Compras de la Corporación de Puerto Rico para la Difusión Pública; [12] Reglamento para la Administración, Operación y Funcionamiento del Proyecto

---

[12] Reglamento Núm. 5748 de 23 de octubre de 1997.

de Comunicación;[13] y el Reglamento para la Administración, Operación y Funcionamiento del Programa de Producción de Telenovelas, Miniseries y Unitarios de Televisión de la Corporación de Puerto Rico para la Difusión Pública.[14] Hemos tenido la oportunidad de examinar detenidamente cada uno de estos reglamentos y no nos cabe la menor duda de que, si bien éstos reglamentan las operaciones de la emisora televisiva, de igual forma impactan los intereses de la ciudadanía en general -- artistas, productores, directores, anunciantes-- interesada en participar y/o forma parte de la oferta televisiva que dicha estación le brinda al país. Siendo ello así, este tipo de funcionario, por las tareas cuasi-legislativa que realiza, puede ser delegado por la Asamblea Legislativa un grado de independencia mayor, por lo que una limitación razonable al poder de destitución del(la) Gobernador(a) estaría permitida.

B.

Dicho ello, y no tratándose aquí de funcionarios que realizan tareas "puramente ejecutivas" nos resta por determinar, si las restricciones impuestas al poder de destitución del(la) Gobernador(a), a través del Art. 3 de la Corporación de Puerto Rico para la Difusión Pública, *supra*, inciden en la facultad de este último para cumplir y hacer cumplir las leyes.

---

[13] Reglamento Núm. 6686 de 3 de octubre de 2003.
[14] Reglamento Núm. 6554 de 2 de enero de 2003.

Para ello, basta con señalar que, al estar envueltos aquí funcionarios que se desempeñan como miembros de una corporación pública con <u>existencia perpetua</u> y <u>personalidad jurídica independiente,</u> 27 L.P.R.A. sec. 501, donde de ordinario sus recursos deben utilizarse para fines educativos, culturales y de servicio al pueblo en general y no para propósitos particulares, ni para propaganda político-partidista o sectaria, 27 L.P.R.A. 502, la imposición de un requisito de "justa causa" es un mecanismo útil que lejos de impedir que el(la) Gobernador(a) ejerza sus prerrogativas constitucionales, ayuda a garantizar la independencia e imparcialidad de la Corporación de Puerto Rico para la Difusión Pública. Esto se debe a que este requisito evita el que, por razones político-partidista, una sola administración gubernamental pueda sustituir súbitamente a una Junta de Directores de una Corporación Publica sin cumplir con los requisitos de la ley orgánica correspondiente, frustrando así los propósitos por los cuales dicha corporación fue creada.

Evidentemente, el Art. 3 de la Ley Orgánica de la Corporación de Puerto Rico para la Difusión Pública, la cual requiere "justa causa" para la destitución de aquellos miembros de la Junta de Directores que no sean miembros *ex officio*, no interfiere impermisiblemente con la obligación constitucional del(la) Gobernador(a) de cumplir y hacer cumplir las leyes. <u>Todo lo contrario, el</u>

gobernante conserva la autoridad para destituir a aquellos funcionarios que lejos de cumplir con los propósitos de ley, han utilizado su posición para adelantar otros fines o han incumplido con sus deberes y obligaciones.

VI

Por los fundamentos antes expuestos, es forzoso concluir que el requisito de justa causa para la destitución por el(la) Gobernador(a) de un miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública, contemplado en la ley orgánica de la referida corporación, no infringe las facultades constitucionales que tiene el(la) Gobernador(a) de remover funcionarios públicos.

Se dictará la Sentencia correspondiente.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Arturo Guzmán Vargas

    Demandante

       v.              CT-2003-002      Certificación

Hon. Sila M. Calderón, *et al.*

    Demandados


SENTENCIA


San Juan, Puerto Rico, a 23 de marzo de 2005.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte integral de la presente, certificamos que el requisito de justa causa para la destitución por el(la) Gobernador(a) de un miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública, contemplado en la ley orgánica de la referida corporación, no infringe las facultades constitucionales que tiene el(la) Gobernador(a) de remover funcionarios públicos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez emitió Opinión de Conformidad a la que se unieron los Jueces Asociados señores Rebollo López y Corrada del Río. La Jueza Asociada señora Fiol Matta concurre con lo resuelto por este Tribunal en la Parte II de la Opinión *Per Curiam* y disiente sin opinión escrita de las Partes III, IV (A)(B) y V (A)(B). La Jueza Asociada señora Rodríguez Rodríguez inhibida.


                  Aida Ileana Oquendo Graulau
                Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Arturo Guzmán Vargas

       Demandante

         v.

Honorable Sila María Calderón, etc., et al

       Demandado

CT-2003-002        Certiorari


Opinión de Conformidad emitida por el Juez Asociado señor Rivera Pérez a la que se unieron los Jueces Asociados señor Rebollo López y Corrada del Río.


San Juan, Puerto Rico, 23 de marzo de 2005.

El señor Arturo J. Guzmán Vargas presentó demanda sobre violación de sus derechos civiles ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico contra la honorable Sila María Calderón Serra, entonces Gobernadora de Puerto Rico, de ahora en adelante "la Gobernadora", y el honorable César R. Miranda Rodríguez, Secretario de la Gobernación, ambos en su capacidad personal y oficial. El referido demandante alegó que fue destituido sumariamente por "la Gobernadora", a principio del término de

su administración, de su posición como miembro no *ex officio* y Presidente de la Junta de Directores (de ahora en adelante Junta) de la Corporación de Puerto Rico para la Difusión Pública (de ahora en adelante Corporación). Arguyó que le violaron sus derechos al amparo de la Primera Enmienda y de la cláusula de debido proceso de ley, protegidos por la Constitución de los Estados Unidos. La parte demandada ante ese tribunal presentó moción de sentencia sumaria; solicitó la desestimación de la demanda. Apoyó tal pedimento en el fundamento de que el requisito de terminación por justa causa dispuesto por el Artículo 3 de la Ley número 216 del 12 de septiembre de 1996[15] para los miembros no *ex officio* de la Junta de la Corporación es inválido bajo la Constitución de Puerto Rico debido a que es violatorio al principio de separación de poderes contenido en ese magno documento y a la Sección 4 de su Artículo IV, *infra*. La Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico entendió que la disposición de tal asunto de derecho, a tenor con la Constitución de Puerto Rico, podía determinar la resolución de la reclamación sobre el derecho a un debido proceso de ley y podría, además, determinar inclusive la resolución de la reclamación bajo la Primera Enmienda, ambos derechos protegidos por la Constitución de Estados Unidos. Entendió, además, que no existían precedentes claros del Tribunal Supremo de Puerto Rico sobre tal asunto. Por tal

---

[15] 27 L.P.R.A. sec. 503.

motivo solicitó ante nos la certificación interjurisdiccional de tal asunto a tenor con la Regla 25 de nuestro Reglamento, de modo que esta Curia pudiera tener la oportunidad de atender el planteamiento de la parte demandada ante ese foro, bajo la Constitución de Puerto Rico.

I

**Hechos Relevantes**

Los hechos relevantes al asunto certificado a esta Curia por la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico han sido determinados por ese Tribunal y no están en disputa por las partes ante ese foro. El demandante ante ese Tribunal, señor Guzmán Vargas fue miembro no *ex officio* de la Junta de la Corporación desde el 1994. El 7 de diciembre de 2000 fue electo como su nuevo Presidente.[16] A tenor con el Artículo 3 de la Ley Número 216 del 12 de septiembre de 1996, *supra* los miembros no *ex officio* de la Junta disfrutan de un término fijo, nombrados por el Gobernador(a) de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico, y sólo pueden ser removidos de sus cargos por justa causa. El 3 de enero de 2001 "la Gobernadora", recién juramentada, emitió la Orden Ejecutiva Número OE-2001-03 mediante la cual le requirió a

---

[16] El señor Guzmán Vargas fue nombrado por el entonces Gobernador de Puerto Rico, honorable Pedro Rosselló González, el 27 de septiembre de 2000 como miembro no *ex officio* de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública para un segundo término. Fue confirmado por el Senado de Puerto Rico y su nuevo término expiraba el 12 de septiembre de 2005.

todas las agencias y dependencias del Poder Ejecutivo, incluyendo a las corporaciones públicas, excepto la Universidad de Puerto Rico, a congelar todas las posiciones vacantes y a detener las transferencias de personal y nuevos nombramientos así como la otorgación o emisión de contratos de servicios o consultoría, ya fueran nuevos o enmendados, a menos que fueran aprobados por el Secretario de la Gobernación. El 24 de enero de 2001 el señor Guzmán Vargas fue informado por el señor Jorge Inserni, Presidente de la Corporación, de la emisión de la referida Orden Ejecutiva y que existía una cantidad sustancial de contratos de la Corporación que vencían al 31 de enero de 2001 y que estaban pendientes de renovación. Le indicó, además, que el asesor legal, licenciado Luis Rullán, estaba estudiando la aplicación de esa Orden Ejecutiva a la Corporación. Posteriormente el licenciado Rullán le comunicó al señor Inserni su opinión legal a los efectos que la referida Orden Ejecutiva no le aplicaba a la Corporación. El señor Guzmán Vargas, el señor Inserni y el licenciado Rullán acordaron diferir temporeramente el otorgamiento de los contratos pendientes hasta que se le informara a "la Gobernadora" de las bases legales de la conclusión y posición de la Corporación sobre la inaplicabilidad a la Corporación de dicha Orden Ejecutiva. El señor Guzmán Vargas y el licenciado Rullán enviaron el 24 de enero de 2001 una carta a "la Gobernadora" informándole que la Corporación está exenta de cumplir con las Ordenes Ejecutivas, emitidas por

el Gobernador(a) de Puerto Rico.  El 1 de febrero de 2001 el señor Guzmán Vargas fue informado por el  señor Inserni de dos (2) llamadas telefónicas que recibiera ese mismo día del señor Miranda Rodríguez, Secretario de la Gobernación, relacionadas con su carta de fecha del 24 de enero de 2001. Durante la referida conversación telefónica el Secretario de la Gobernación alegadamente le indicó al señor Inserni que el señor Guzmán Vargas y toda la Junta de la Corporación tenían que renunciar.  El Secretario de la Gobernación le envió al señor Inserni, además, una contestación por escrito a la carta que le enviara el señor Guzmán Vargas a "la Gobernadora" el 24 de enero de 2001, cuyo contenido posteriormente se hizo público.  Ese mismo día fue señalada una reunión del Comité Ejecutivo y de la Junta de la Corporación que fue posteriormente cancelada.  Algunos de los miembros de la Junta que no recibieron la notificación de cancelación de la reunión se personaron a las oficinas de la Corporación y se reunieron informalmente con el señor Guzmán Vargas, el señor Inserni y con el licenciado Rullán y recibieron de éstos información sobre lo ocurrido.  En ese momento concluyeron que el señor Guzmán Vargas tenía un deber ministerial de adherirse a la ley y al contenido de una Resolución de la Junta del 7 de diciembre de 2000 sobre el principio estatutario de autonomía de la Corporación. Después de celebrada la referida reunión informal el señor Guzmán Vargas, el señor Inserni y el licenciado Rullán redactaron una carta que le enviaron al día siguiente al

Secretario de la Gobernación. Este último respondió a la misma mediante otra carta enviada al señor Guzmán Vargas. El Comité Ejecutivo de la Corporación se reunió para evaluar la carta recibida de parte del Secretario de la Gobernación. Como resultado de esa reunión el señor Guzmán Vargas celebró una conferencia de prensa el 6 de febrero de 2001 para anunciar que la Corporación a través de su Presidente, señor Inserni, otorgaría todos los contratos que estaban pendientes. Quince (15) o veinte (20) minutos después de concluida la conferencia de prensa llegó un mensajero con una carta de "la Gobernadora" destituyendo al señor Guzmán Vargas de su posición como miembro no *ex officio* y Presidente de la Junta de la Corporación por insubordinación.

La Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico puntualiza y define el asunto que solicita su certificación a esta Curia. Nos pregunta específicamente si el requisito de justa causa para la destitución de un miembro no *ex officio* de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública dispuesto por la Ley Número 216 del 12 de septiembre de 1996, *supra,* es inválido por ser violatorio al principio de separación de poderes, Artículo I, Sección 2 de la Constitución de Puerto Rico[17] y al Artículo IV, Sección 4

---

[17] Constitución de Puerto Rico, L.P.R.A., Tomo I, ed. 1999, pág.256.

de ese magno documento.[18]  Expresa dicho tribunal sobre el efecto que considera pueden tener sobre la  controversia ante  sí las posibles contestaciones por esta Curia al asunto que nos solicita su certificación.  Considera que de concluir esta Curia que el requisito de justa causa para la destitución de un miembro no *ex officio* de la Junta de la Corporación dispuesto por ley es inválido por ser violatorio del Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, el señor Guzmán Vargas no tendría un derecho o interés propietario en su posición de miembro no *ex officio* y Presidente de la Junta, y por ende no tendría una causa de acción bajo la cláusula de debido proceso de ley federal. Considera, que de llegar a esa conclusión esta Curia, además, podría determinar que la posición ocupada por el señor Guzmán Vargas es una de "oficial ejecutivo" equivalente a un miembro del Gabinete de la Gobernadora de Puerto Rico.  De ser así, considera que éste no tendría causa de acción bajo la Primera Enmienda de la Constitución de Estados Unidos por ocupar una posición cuya función comprende la formulación de política pública.

El 7 de noviembre de 2003 emitimos Resolución concediéndole término simultáneo a las partes para presentar sus alegatos.  El 9 de febrero de 2004 el Procurador General de Puerto Rico presentó una "Solicitud de Comparecencia como *Amicus Curiae*" que  fue acogida por  este Tribunal  el 2 de

---

[18] Íd., pág. 385.

marzo de 2004. Se le concedió un término de treinta (30) días para presentar su posición por escrito. Habiendo las partes presentado sus alegatos y el Procurador General su escrito fijando su posición expedimos el auto de certificación solicitado y procedemos a contestar las interrogantes de derecho bajo la Constitución de Puerto Rico, que así solicita de esta Curia su certificación la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico.

II

**CORPORACIÓN DE PUERTO RICO PARA LA DIFUSIÓN PÚBLICA**

El Artículo 1 de la Ley Número 216 de 12 de septiembre de 1996,[19] dispone lo siguiente:

**Creación**

**Se crea una corporación pública, como instrumentalidad del Estado Libre Asociado de Puerto Rico, bajo el nombre de Corporación de Puerto Rico para la Difusión Pública. La Corporación tendrá existencia perpetua con personalidad jurídica independiente y separada de cualquier otra entidad, agencia, departamento o instrumentalidad del Gobierno de Puerto Rico y estará regida por una Junta de Directores.** Se establece el 30 de junio de 1996 la fecha en que la Corporación de Puerto Rico para la Difusión Pública dejará de ser subsidiaria de la Autoridad de Teléfonos. Sucesivamente, la fecha de cierra [sic] de cada año fiscal será el 30 de junio de cada año. (Énfasis suplido).

El Artículo 2 de la Ley Número 216 de 12 de septiembre de 1996[20] dispone lo siguiente:

---

[19] 27 L.P.R.A. sec. 501.

[20] 27 L.P.R.A. sec. 502.

**Propósito legislativo**

La Asamblea Legislativa de Puerto Rico, mediante la aprobación de esta Ley, **independiza a la Corporación de Puerto Rico para la Difusión Pública de la Autoridad de Teléfonos de Puerto Rico** para **continuar** ofreciendo los servicios de excelencia que la caracterizan **de una manera más eficiente y adecuada**. Con una **autonomía operacional y funcional genuina, elemento necesario para desarrollar sus facilidades y ofrecer una difusión conforme a las disposiciones y limitaciones legales que se establecen y así ofrecer un servicio público óptimo.** Tales facilidades **deberán usarse** para **fines educativos, culturales** y **de servicios al pueblo en general** y **no para propósitos particulares, ni para propaganda político-partidista o sectaria**, a excepción de los [sic] dispuesto en la sec. 3110 del Título 16, parte de la "Ley Electoral de Puerto Rico".

Los programas difundidos por la Corporación de Puerto Rico para la Difusión Pública **se guiarán por una política de excelencia, objetividad y balance en todo lo que fuere de naturaleza controversial.**

La programación deberá **reflejar armonía entre la enseñanza del conocimiento y la información práctica.** Deberá además, enfatizar **la visión más amplia del conocimiento, con atención en la filosofía y la percepción de la realidad social, económica y cultural como algo ligado a la historia**, y a su vez que comprometido con un mejor futuro. **La programación de las emisoras deberá contribuir al desarrollo de una conciencia critica [sic] y ejemplarizar en sus difusiones el respeto a la dignidad y a los valores humanos.** (Énfasis suplido).

El Artículo 3 de la Ley Número 216 de 12 de septiembre de 1996, *supra* dispone lo siguiente:

**Junta de Directores**

Los poderes, facultades y deberes de la Corporación de Puerto Rico para la Difusión Pública se ejercerán, y su política

operacional y administrativa se determinará, por una Junta de Directores.

**La Junta estará integrada por el Secretario de Educación, el Presidente de la Universidad de Puerto Rico, el Director Ejecutivo del Instituto de Cultura Puertorriqueña** y **ocho (8) ciudadanos provenientes del sector privado en representación del interés público, quienes serán nombrados por el Gobernador con el consejo y consentimiento del Senado y por lo menos tres (3) deberán ser personas de comprobado interés, conocimiento y experiencia en educación, cultura, artes, ciencias o comunicaciones de radio y televisión. El Presidente de la nueva corporación será miembro de la Junta de Directores; no obstante, no tendrá derecho al voto ni podrá ocupar ningún cargo de oficial en dicha Junta. Los nombramientos de los miembros de la Junta se harán por lo siguientes términos: dos (2) miembros por seis (6) años; dos (2) miembros por cinco (5) años; dos(2) miembros por cuatro (4) años y dos (2) miembros por tres (3) años, y hasta que sus sucesores sean nombrados y tomen posesión del cargo. Una vez concluya cada término el mismo será uno fijo por seis (6) años.** Con el propósito de viabilizar y facilitar el proceso de transición de este nuevo capítulo, se dispone que el término individual de cada miembro actual de la Junta de Directores comenzará a partir de la fecha de aprobación del mismo. Cualquier vacante en dichos cargos será cubierta por el término sin expirar del que hubiese ocasionado la misma, mediante nombramiento que deberá hacerse dentro de un término no mayor de sesenta (60) días contados a partir de la fecha en que ocurra la vacante. Disponiéndose, que las personas con intereses económicos, directos y sustanciales en la industria comercial de la radio y televisión no podrán ser miembros de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública. Disponiéndose, además, **que seis (6) miembros de la Junta de Directores constituirán quórum para el manejo de los asuntos de la Corporación y toda decisión deberá adoptarse por mayoría. La función de los miembros de la Junta de Directores, así como la**

**asistencia a las reuniones, será indelegable.**

**La Junta de Directores se reunirá, organizará y elegirá dentro de sus miembros un Presidente, un Vicepresidente, quien sustituirá al Presidente en su ausencia, y un Secretario. La Junta también nombrará un Presidente para la Corporación de Puerto Rico para la Difusión Pública.** Dicho funcionario ocupara [sic] su cargo a voluntad de la Junta y esta [sic] determinará sus funciones, responsabilidades y deberes, y fijará su remuneración y otros beneficios.

Los miembros de la Junta no percibirán remuneración alguna por el desempeño de sus funciones como tales, pero aquellos que no sean funcionarios o empleados públicos tendrán derecho a una dieta de cincuenta dólares ($50) por cada reunión a la que asistan.

La Junta de Directores de la nueva Corporación de Puerto Rico para la Difusión Pública tendrá facultad para aprobar, enmendar y derogar aquellos reglamentos que estime necesarios o convenientes para llevar a cabo sus fines, propósitos y actividades. La Junta de Directores determinará la distribución y el uso de su presupuesto de mejoras capitales y el de operaciones a tono con sus planes y necesidades y podrá delegar en el Presidente o en cualesquiera otros de sus funcionarios, empleados o agentes aquellos poderes y deberes que estime propios, excepto la facultad de aprobar, enmendar y derogar reglamentos.

**El Presidente tendrá a su cargo la administración general de la Corporación de Puerto Rico para la Difusión Pública, y será responsable a la Junta de Directores de la ejecución de la política que ésta establezca y de la supervisión general de todos los funcionarios, empleados y agentes de la misma.** Este podrá, además, delegar cualquier función en el personal o funcionario de la Corporación que así determine.

**Los miembros de la Junta de Directores que no sean miembros *ex officio* sólo podrán**

**ser removidos por justa causa**. (Énfasis suplido).

El Artículo 4 de la Ley Número 216 de 12 de septiembre de 1996[21] dispone lo siguiente:

**Poderes generales**

*(a)Difusión Pública* – La Corporación de Puerto Rico para la Difusión Pública **divulgará e impulsará programas educativos, deportivos, artísticos, musicales, culturales y de interés público, todo ello con arreglo a las limitaciones establecidas en las franquicias otorgadas por la Comisión Federal de Comunicaciones de los Estados Unidos de América.**

Se otorgan a la Corporación de Puerto Rico para la Difusión Pública **todos los poderes necesarios y convenientes para llevar a cabo y realizar sus propósitos y funciones**, incluyendo, pero sin limitarse, a los siguientes:

1. Tener existencia perpetua como **corporación pública independiente, con fines no pecuniarios.**

2. Adoptar, alterar y usar un sello corporativo.

3. Adoptar, enmendar y derogar reglamentos para regir sus asuntos y sus actividades y para prescribir las reglas, reglamentos y normas necesarios para el cumplimiento de sus funciones y deberes, conforme a lo establecido en las secs. 2101 et seq. del Título 3, conocidas como "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico".

4. Mantener oficina en el lugar o lugares que determine.

5. Demandar y ser demandada.

6. Recibir, administrar y cumplir con las condiciones y requisitos legales respecto a cualquier regalo, concesión

---

[21] 27 L.P.R.A. sec. 504.

o donación de cualquier propiedad mueble
o inmueble, recursos económicos y otros.

7. **Hacer y formalizar convenios, arrendamientos, contratos y otros instrumentos necesarios o pertinentes en el ejercicio de sus poderes y funciones.**

8. Adquirir cualquier propiedad o interés en la misma por cualquier medio legal, incluyendo sin limitarse, a la adquisición por compra, arrendamiento, manda, legado o donación y poseer, conservar, usar y operar tal propiedad o interés en la misma.

9. Adquirir, construir, reconstruir, mejorar, expandir, conservar y aprovechar al máximo cualesquiera facilidades de difusión.

10. **Fijar y cobrar tarifas razonables, derechos y cargos y otros términos y condiciones de servicios por el uso de sus facilidades de difusión** o por cualquier equipo vendido o arrendado, a tenor con los reglamentos y las leyes locales y federales que apliquen.

11. **Nombrar y contratar aquellos funcionarios y empleados y conferirles aquellos poderes y deberes, así como compensarles por sus servicios de acuerdo a las disposiciones de la Junta de Directores, y de acuerdo al reglamento de personal que se promulgue.** El personal de la Corporación de Puerto Rico para la Difusión Pública quedará excluido de las disposiciones de las secs. 1301 et seq. del Título 3, conocidas como "Ley de Personal del Servicio Público de Puerto Rico". No obstante, la Corporación de Puerto Rico para la Difusión Pública deberá honrar el Principio de Mérito de acuerdo a lo dispuesto en la sec. 1338 del citado título.

12. **Realizar todos los actos necesarios o convenientes para llevar a cabo los**

**poderes que le confiere este capítulo o cualquier otra ley.**

**13.     Aceptar, promover y estimular a la ciudadanía   a   hacer   donativos   de cualquier   clase,   siempre   que   su aceptación no conlleve la obligación de transmitir   información   o   material   en conflicto con las normas que rigen sus transmisiones.**

**Asimismo, cualquier donativo hecho a la Corporación de Puerto Rico para la Difusión Pública de Puerto Rico podrá reclamarse   en   su   totalidad   como   una deducción del ingreso bruto individual o del   ingreso   bruto   de   corporaciones   o sociedades,** según aplique y sin sujeción a las disposiciones de la sec. 8423 (aa) (2)   (M)   del   Título   13.   (Énfasis suplido).

El Artículo 6 de la Ley Número 216 de 12 de septiembre de 1996[22] dispone lo siguiente:

**Prohibición de operación por empresa privada**

La   Corporación   de   Puerto   Rico   para   la Difusión   Pública   no   podrá,   aún   con   autorización previa   de   la   Comisión   Federal   de   Comunicaciones, vender,   transferir,   alquilar,   gravar,   enajenar,   o cualquier   otra   transacción   que   tenga   como propósito   que   dicha   Corporación   y   los   servicios operados   por   la   misma,   sean   administrados   u operados por una empresa privada.

**Las emisoras de radio y televisión operadas a través de la nueva Corporación de Puerto Rico para la Difusión Pública, son de carácter educativo, cultural y patrimonial del Pueblo de Puerto Rico y éstas deberán mantenerse como foro público para libre expresión. (Énfasis suplido).**

El Artículo 7 de la Ley Núm. 216 de 12 de septiembre de 1996[23] dispone lo siguiente:

**Autonomía**

_____

[22] 27 L.P.R.A. sec. 506.
[23] 27 L.P.R.A. sec. 507.

**Se prohíbe a cualquier persona ejercer presión o influencia indebida en los representantes de dicha entidad corporativa. Se dispone que la Junta de Directores deberá proteger la credibilidad de la Corporación de Puerto Rico para la Difusión Pública de Puerto Rico y evitar intervenciones no apropiadas para así preservar la completa responsabilidad por la autonomía de las funciones de la institución.**

A fin de mantener **la autonomía programática de la Corporación de Puerto Rico para la Difusión Pública, ésta presentará anualmente al Gobernador una relación de los desembolsos totales que espera realizar en sus actividades y funcionamiento.** Reseñará, además, el plan de mejoras capitales y la adquisición de activos tales como propiedades que sean necesarias al cumplimiento de los fines de este capítulo. (Énfasis suplido).

El Artículo 8 de la Ley Número 216 de  12 de septiembre de 1996[24] dispone lo siguiente:

**Contrato de construcción y compra**

Todas las compras y **contratos de suministros o servicios, excepto servicios personales,** que se hagan por la Corporación, incluyendo contratos para la construcción de obras, deberán hacerse mediante anuncio de subasta, hecho con la suficiente antelación a la fecha de apertura de pliegos de propuesta para que la Corporación asegure el adecuado conocimiento y oportunidad de concurrencia; Disponiéndose, que cuando la suma estimada para la adquisición y obra no exceda de veinticinco mil (25,000) dólares, podrá efectuarse la misma sin anuncio de subasta. Asimismo, no serán necesarios anuncios de subasta, cuando:

(1)   Debido a una emergencia se requiera la inmediata entrega de materiales, efectos y equipo, o ejecución de servicios;

(2)   se necesiten piezas de repuesto, accesorios, equipo o servicios suplementarios o compatibles para efectos o servicios previamente suministrados o contratados;

---

[24] 27 L.P.R.A. sec. 508.

(3) **se requieran servicios o trabajos de profesionales o de expertos y la Corporación estime que, en aras de una buena administración tales servicios o trabajos deban contratarse sin mediar tales anuncios, o**

(4) los precios no estén sujetos a competencia, porque no haya más que una sola fuente de suministro o porque estén regulados por este capítulo.

Disponiéndose, que en tales casos, la compra de materiales, efectos y equipo, **o la obtención de tales servicios podrá hacerse en mercado abierto en la forma usual de la práctica comercial.**

Al comparar propuestas y hacer adjudicaciones, se dará debida consideración, además de si el postor ha cumplido con las especificaciones a factores tales como la habilidad del postor para realizar trabajos de construcción de la naturaleza envuelta en el contrato bajo consideración, la calidad y adaptabilidad relativa de los materiales, efectos o servicios, la responsabilidad económica del licitador y su pericia, experiencia, reputación de integridad comercial y habilidad para prestar servicios de reparación y conservación; el tiempo de entrega o de ejecución que se ofrezca y si el lugar de manufactura de los materiales, efectos y equipo radicada en Puerto Rico. (Énfasis suplido).

El Artículo 13 de la Ley Número 216 de 12 de septiembre de 1996[25] dispone lo siguiente:

**Prohibición de servicios gratuitos**

**Las facilidades de la Corporación no serán usadas de forma gratuita por ninguna persona o entidad.**

Al mismo tiempo, se ordena y autoriza a la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública y a su Presidente, **que al establecer sus planes de programación y uso de las facilidades de difusión, se le conceda trato preferencial y especial a las necesidades y requerimientos**

---

[25] 27 L.P.R.A. sec. 513.

**del Departamento de Educación, del Instituto de Cultura Puertorriqueña y de la Universidad de Puerto Rico en cuanto a tiempo, horario y precio,** entre otros, todo ello en armonía con una sana política de programación. (Énfasis suplido).

## REGLAS DE HERMENEUTICA

**Nuestro deber, dentro de la forma republicana del gobierno, requiere que interpretemos la ley y despejemos las lagunas que existan en la misma, utilizando como guía la intención del legislador.** En <u>Alejandro Rivera v. E.L.A.</u>,[26] nos expresamos al respecto de la manera siguiente:

> Además, nos señala R. E. Bernier y J.A. Cuevas Segarra, en su obra *Aprobación e interpretación de las leyes de Puerto Rico*, 2da. Ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 299, que "[b]ajo un sistema de separación de poderes como el que funciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. En el desempeño normal de sus funciones, los tribunales están obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa. Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable".

---

[26] 140 D.P.R. 538, 545 (1996).

Es norma reiterada de hermenéutica que la letra clara de una ley es la mejor expresión del espíritu de la misma.[27] A esos efectos el artículo 14 del Código Civil de Puerto Rico[28] dispone que "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Este precepto estatutario reconoce que la ley está sujeta a ser interpretada, pero limita la interpretación a lo que surja del texto claro de la misma.

El artículo 19 de Código Civil de Puerto Rico[29] reconoce que el espíritu de la ley, reflejado en la intención legislativa, es la mejor herramienta para encontrar el verdadero sentido de una ley. Como mencionáramos anteriormente, el ejercicio de la interpretación estatutaria está limitado por varias reglas de deferencia y abstención de parte de la Rama Judicial. El tribunal tiene que buscar la voluntad del legislador.[30] El espíritu de la ley juega un papel fundamental en la interpretación de un estatuto. **La intención del legislador al aprobar una ley es tan importante que hemos establecido,**

---

[27] <u>Santiago v. Supte. Policía de P.R.</u> res. el 23 de junio de 2000, 2000 T.S.P.R. 95, 151 D.P.R.____(2000), 2000 J.T.S. 115; <u>Alejandro Rivera v. E.L.A.</u>, supra; <u>Meléndez v. Tribunal Superior</u>, 90 D.P.R. 656 (1964).

[28] 31 L.P.R.A. sec. 14.

[29] Íd., sec. 19.

[30] <u>Alejandro Rivera v. E.L.A.</u>, *supra*.

**que si la letra clara de una ley está en contraposición con su espíritu, claramente establecida en el historial legislativo, prevalecerá este último.**[31] Por otro lado, hemos resuelto que la función de los tribunales es la de interpretar la ley y no juzgar la sabiduría del legislador al aprobarla.[32]

En el caso de <u>Clínica Juliá v. Sec. de Hacienda</u>,[33] expresamos lo siguiente:

> El juez es un intérprete, y no un creador. **Su facultad de interpretación adquiere relevancia cuando del estatuto surgen varios significados probables que suministren un margen adecuado para selección judicial, pero si el lenguaje es tan inequívoco que postula un solo significado, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa.** (Énfasis suplido).

Siguiendo esta misma línea, nos expresamos en el caso de <u>Meléndez v. Tribunal Superior</u>[34] de la manera siguiente:

> En *Parrilla v. Loíza Sugar Company*, 49 D.P.R. 597, 600 (1936), expusimos que "La regla de estricta hermenéutica no exige ni puede justificar que se elimine mediante legislación judicial cualquier

---

[31] <u>Sucn. Alvarez v. Srio. de Justicia</u>, res. el 11 de febrero de 2000, 2000 T.S.P.R. 21, 150 D.P.R.____ (2000), 2000 J.T.S. 40; <u>Pueblo v. Zayas Rodríguez</u>, 147 D.P.R. 530 (1999); <u>Figueroa v. Díaz</u>, 75 D.P.R. 163 (1953).

[32] <u>Alonso García v. S.L.G.</u>, res. el 6 de septiembre de 2001, 2001 T.S.P.R. 126, 155 D.P.R.____ (2001), 2001 J.T.S. 129; <u>Famanina v. Corp. Azucarera de P.R.</u>, 113 D.P.R. 654 (1982).

[33] 76 D.P.R. 509, 521 (1954). Véase, además: <u>Srio. del Trabajo v. G.P. Inds., Inc.</u>, res. el 17 de enero de 2001, 2001 T.S.P.R. 4, 153 D.P.R. ____ (2001), 2001 J.T.S. 7.

[34] 90 D.P.R. 656, 661-662 (1964); Véase, además: <u>Martínez v. Rodríguez</u> res. el 13 de agosto de 2003, 2003 T.S.P.R. 134, 160 D.P.R. ___ (2003), 2003 J.T.S. 134.

parte de una ley, no importa cuál pueda ser la opinión del tribunal respecto a la conveniencia de la misma". Creemos justificado añadir que cuando los términos de un estatuto son claros y susceptibles de una interpretación inequívoca según el significado común y corriente de sus palabras y su construcción gramatical, bajo la misma regla tampoco debemos intercalar palabras ni suplir omisiones al interpretario [sic].

El principio de deferencia a la voluntad legislativa es tal que una omisión por inadvertencia del legislador no puede ser curada mediante fiat judicial. La doctrina del casus omissus, nos lo impide. Sobre ese particular Bernier y Cuevas Segarra expresan lo siguiente[35]:

**Es una regla de hermenéutica legal que las omisiones del legislador no pueden ser curadas por los tribunales. Esa es la regla general tal como es expuesta corrientemente por los tribunales y se refiere a los casos en que el lenguaje del estatuto ha omitido algo que tampoco está dentro del propósito del mismo, pero que es claro de su lectura integral que fue omitido por inadvertencia. La razón de la regla es que el tribunal sólo interpreta y no legisla.**

La regla se ha expresado en la siguiente forma: Al interpretar un estatuto, la intención legislativa debe ser buscada en el lenguaje usado en él con la ayuda que permiten las reglas de hermenéutica legal. **Pero un lenguaje nuevo o una disposición enteramente nueva no se puede leer en el en el estatuto para darle un significado que no está incluido en él. Aunque el tribunal puede interpretar frases oscuras y dudosas para darle efecto a la presunta intención del legislador y llevar a cabo los propósitos de la ley; no se puede por interpretación curar**

---

[35] R.E. Bernier y J. A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da. ed., San Juan, Pubs. J.T.S., 1987, Vol. I, Cap. 47, pág. 311.

**un casus omissus, no importa lo justo y deseable que pueda parecer.** *Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 662 (1964) (Ramírez). (Énfasis nuestro).

Al descargar nuestra función de interpretar una disposición particular de un estatuto los tribunales debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarlo, de manera que nuestra interpretación asegure la efectividad de la intención que lo anima.[36] Todo acto legislativo persigue un propósito, trata de corregir un mal, alterar una situación existente, complementar una reglamentación vigente, fomentar algún bien específico o bienestar en general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno, entre otros. En el proceso de encontrar el significado de una ley que logre los propósitos del legislador la interpretación debe hacerse con fines socialmente útiles.[37]

La letra del referido estatuto claramente dispone que por virtud del mismo **se creó una corporación pública, como instrumentalidad del E.L.A., con personalidad jurídica, independiente y separada de cualquier otra entidad, agencia, departamento o instrumentalidad del Gobierno de Puerto Rico.** Puntualiza que **tal independencia le permitirá**

---

[36] Irizarry v. J&J Cons. Prods., Co., Inc., res. el 27 de enero de 2000, 2000 T.S.P.R. 15, 150 D.P.R._____ (2000), 2000 J.T.S. 27; Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998); Vázquez v. A.R.P.E., 128 D.P.R. 513 (1991).

[37] Pueblo v. Zayas Rodríguez, *supra*.

**a esa corporación pública ofrecer sus servicios de una manera más eficiente y adecuada.** Define la naturaleza de su difusión pública, como propósito programático y operacional, como uno de carácter **educativo, cultural y patrimonial del Pueblo de Puerto Rico,** y que deberá mantener la operación de sus emisoras de radio y televisión como **foro público para la libre expresión sobre esos temas.** Para ello le concede todos los poderes necesarios y convenientes para llevar a cabo y realizar tales propósitos. Le permite hacer, formalizar y otorgar contratos en el ejercicio de sus poderes y funciones. Para ello puede nombrar y contratar funcionarios y empleados y realizar todos los actos necesarios o convenientes para llevar a cabo esas funciones. **Podrá, además, otorgar contratos de servicios profesionales o de expertos, obtenibles en el mercado abierto en la forma usual de la práctica comercial.** La garantía dispuesta para que la Corporación pueda alcanzar los referidos propósitos reside en la concesión de una **autonomía operacional y funcional genuina,** elemento que considera necesario para ofrecer una difusión pública conforme a las disposiciones y limitaciones legales que le asisten y regulan. Tal ejercicio se habrá de guiar por una política de **excelencia, objetividad y balance en todo lo que fuere de naturaleza controversial.** El estatuto **prohibe a cualquier persona ejercer presión o influencia indebida en los representantes de dicha entidad corporativa. Le manda y le exige a su Junta de Directores el proteger la credibilidad de la**

**Corporación y el evitar intervenciones no apropiadas, para de esa forma preservar la integridad de su responsabilidad institucional con la autonomía de sus funciones.** Dispone, para ello, que su Junta de Directores estará integrada de once (11) miembros; tres (3) miembros *ex officio*[38]; **y ocho (8) miembros no *ex officio*.** Éstos últimos habrán de ser nombrados por el Gobernador(a) de Puerto Rico con el consejo y consentimiento del Senado, por un término fijo. Los tres (3) miembros *ex officio* son el Secretario de Educación, el Presidente de la Universidad de Puerto Rico y el Director Ejecutivo del Instituto de Cultura Puertorriqueña. **Los demás ocho (8) miembros no *ex officio* son ciudadanos provenientes del sector privado, y por lo menos tres (3) deberán ser personas de comprobado interés, conocimiento y experiencia en educación, cultura, artes, ciencias o comunicaciones en los medios de radio y televisión.** Los miembros *ex officio* pueden ser removidos de la Junta por el Gobernador(a) de turno a su discreción. Los miembros no *ex officio* sólo pueden ser removidos de sus puestos por justa causa.

La Ley Número 216, *supra,* persigue un propósito específico, fomenta un bien general y a la misma vez protege derechos individuales. Persigue el propósito específico de establecer un medio de comunicación por radio y televisión,

---

[38] Por virtud de su cargo; definición obtenida del diccionario de: I. Rivera García, <u>Diccionario de Términos Jurídicos</u>, Orford, New Hampshire, Equity Publishing, 1976, pág. 370.

del Pueblo de Puerto Rico, como foro público para la libre expresión de la ciudadanía, y para la difusión de la formulación de política pública del gobierno sobre las áreas de educación y cultura, entre otros. Fomenta el bienestar general a través del principio de autonomía funcional y operacional de la Corporación pues persigue el funcionamiento armonioso de la democracia constitucional que vivimos los puertorriqueños al permitir que sus ciudadanos utilicen tal foro público mediante el pago de tarifas razonables, para expresarse libremente sin intervención y dirigismo del gobierno de turno, y a estar adecuada y objetivamente informados de los asuntos comprendidos en la política pública formulada por el Gobierno en las áreas de educación y cultura, entre otros. Protege los derechos individuales de los ciudadanos al permitirles participar en uso de su libertad de expresión en los procesos de formulación de opinión pública, sobre los referidos temas, que están irremediablemente atados y relacionados a la democracia que vive Puerto Rico y a sus derechos democráticos.

III

**SEPARACIÓN TRIPARTITA DE PODERES**

El Artículo I, Sección 2 de la Constitución de Puerto Rico[39] dispone lo siguiente:

---

[39] Constitución del E.L.A., L.P.R.A. Tomo 1, ed. 1999, pág. 256.

**Forma de gobierno**

El gobierno del Estado Libre Asociado de Puerto Rico **tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución,** estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. (Énfasis suplido).

El Artículo III, Sección 1 de la Constitución de Puerto Rico[40] dispone lo siguiente:

**Asamblea Legislativa**

El **Poder Legislativo** se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras–el Senado y la Cámara de Representantes–cuyos miembros serán elegidos por votación directa en cada elección general. (Énfasis suplido).

El Artículo IV, Sección 1 de la Constitución de Puerto Rico[41] dispone lo siguiente:

**Gobernador**

El **Poder Ejecutivo** se ejercerá por un Gobernador, quien será elegido por voto directo en cada elección general. (Énfasis suplido).

El Artículo V, Sección 1 de la Constitución de Puerto Rico[42] dispone lo siguiente:

**Poder judicial; Tribunal Supremo; otros tribunales**

El **Poder Judicial** de Puerto Rico se ejercerá por un Tribunal Supremo, y

---

[40] Íd., pág. 365.

[41] Íd., pág. 384.

[42] Íd., pág. 393.

por aquellos otros tribunales que se establezcan por ley. (Énfasis suplido).

La Convención Constituyente de Puerto Rico se inspiró durante el proceso de redacción de nuestra Constitución en los principios de la Constitución de Estados Unidos. Surge de su diario de sesiones lo siguiente:

> Nuestra Constitución debe expresar nuestro entendido de la democracia, coincidente con el desarrollo histórico de este sistema de vida y gobierno en los más avanzados países de Occidente.
>
> ... *que consideramos factores determinantes en nuestra vida colectiva nuestra adhesión a los principios de la Constitución de los Estados Unidos, de cuya ciudadanía estamos investidos;...*
>
> **Nuestra constitución debe expresar nuestro entendido de la democracia, de los Estados Unidos. Nuestra constitución y nuestras leyes se inspiran en los principios de la Constitución federal, a la que hemos jurado colectivamente fidelidad y respeto al recibir y aceptar la ciudadanía americana.** [43] (Énfasis suplido).

La limitación del poder político constituye un principio, desarrollado por la teoría política liberal. Su instrumento fundamental es la distribución del poder. **La libertad es el resultado de la efectiva limitación del poder gubernamental sobre el individuo mediante un sistema donde "el poder frene al poder". Por ello es necesario distribuir el poder entre diversos organismos de gobierno que se sirven**

---

[43] 4 Diario de Sesiones de la Convención 2557 (1961).

**mutuamente de contrapesos evitando de esa forma la concentración de poder gubernamental que pueda poner en peligro precisamente la libertad individual.**[44] **La organización interna de nuestro gobierno mediante la aprobación de nuestra Constitución está estructurada sobre una división tripartita de los poderes gubernamentales, cuyo fin principal es, en síntesis, asegurar la libertad del individuo contra la opresión del gobierno. El principio de la separación de poderes se adoptó por nuestra Asamblea Constituyente con el fin de impedir que se ejercitara un poder arbitrario.** No creemos que tuvo el propósito de evitar las fricciones, **pero sí salvar al pueblo de la autocracia,** disponiendo la forma de resolver las controversias emergentes de la fricción inevitable e incidental a la distribución de los poderes gubernamentales entre las tres ramas de gobierno.

Unos años antes de la aprobación y vigencia de la Constitución de Puerto Rico expresamos en <u>Banco Popular, Liquidador v. Corte</u>[45] lo siguiente:

> No se puede negar que el amplio principio de la separación de poderes ha sido un factor vital en la conservación de nuestras libertades desde su adopción por los Padres de la Patria (Founding Fathers). Pero algunas veces han surgido dificultades debido a la confusión de pensamiento en cuanto a dos problemas causados por el hecho de la

---

[44] R. Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, San Juan, Universidad Interamericana de Puerto Rico, 1997, Vol. I, pág. 571.

[45] 63 D.P.R. 66, 71-72 **(1944).**

existencia de ramas gubernamentales separadas pero de igual calibre.

**En primer lugar, muchos han pasado por alto el hecho de que la separación absoluta nunca ha existido y nunca se pretendió que existiera.** En verdad, Madison escribió en El Federalista que algunos se oponían a la Constitución por la única razón de que no disponía para una verdadera separación de poderes. Pero, como observó Madison, la frase "separación de poderes" es cierta sólo en parte. Nunca se pretendió que cada una de las ramas gubernamentales funcionara en un vacío, completamente independiente y alejada de las otras. **Más bien lo que la Constitución protegía fué [sic] descrito como sigue: "La acumulación de *todos* los poderes, legislativo, ejecutivo y judicial, en las *mismas* manos, bien de una, algunas o muchas personas, y ya sea por herencia, nombramiento propio o electivo, puede declararse con razón que es la definición exacta de la tiranía."** .(El Federalista (editado por Lodge), pág. 300-bastardillas nuestras.) **En verdad se ha sugerido que la confusión engendrada por el uso de la frase "separación de poderes," puede disiparse describiendo el principio como la "separación de funciones últimas".** (Herwitz y Mulligan, The Legislative Investigating Committee, 33 Col. L. Rev. 1,7.) Sea ello como fuere, **a los tribunales les concierne más el significado legal y de hecho del principio en vez de una selección entre breves descripciones competidoras.** Y no se puede afirmar con demasiado énfasis que las ramas gubernamentales están tan interrelacionadas en sus funciones como son independientes entre sí. **En la frase de Madison, los poderes gubernamentales han sido mezclados en vez de separarse. Sostenía que se exigía solamente un grado de separación y que este grado sólo se podía asegurar relacionando y mezclando las ramas. Beard, en La República, pág. 190,**

**describe la intervención y balance (*checks and balances*) que de ello resulta como una clase de equilibrio dinámico.** (Énfasis suplido).

En <u>Hernández Agosto v. López Nieves</u>[46] expresamos lo siguiente:

No es hasta 1952 que se consagra formalmente en la Constitución del Estado Libre Asociado (Art. I, Sec. 2) la existencia de tres poderes, subordinados todos por igual a la soberanía del Pueblo de Puerto Rico. **"Separación de poderes"**, explicaba el Lic. Víctor Gutiérrez Franqui en la Asamblea Constituyente, **al rechazar la insinuación de que una rama del gobierno podría predominar sobre las otras en toda circunstancia, "es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia".** 1 *Diario de Sesiones de la Convención Constituyente* 591 (1951). **El énfasis recayó, como es natural, en la separación, mas no en la independencia absoluta de los poderes entre sí. Lo segundo hubiese creado tres departamentos estancos, con libertad cada cual, por ejemplo, para interpretar a su modo la Constitución del país. El concepto de la independencia absoluta, sin más, es claramente antagónico al sistema de pesos y contrapesos que ilustra la Constitución de Estados Unidos.** Una enmienda propuesta para que la Constitución del Estado Libre Asociado exigiese tal independencia absoluta fue derrotada sin mayor discusión. 3 *Diario de Sesiones de la Convención Constituyente* 1918-1919 (1952).

La naturaleza e importancia de la doctrina de la separación de poderes ha sido objeto de análisis por este Tribunal o varios de sus miembros en distintas ocasiones. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407

___

[46] 114 D.P.R. 601, 619-620 (1983).

(1982); *In re Rodríguez Torres,* 106
D.P.R. 698, 700 (1978); *P.P.D. v.
Ferré, Gobernador*, 98 D.P.R. 338,429
(1970); *Banco Popular, Liquidador v.*

*Corte,* 63 D.P.R. 66 (1944).
(Énfasis suplido).

Las facultades delegadas por el pueblo al Gobierno, en virtud del principio de separación de poderes contenido en la Constitución de Puerto Rico, se distribuyen entre las tres (3) ramas: la Judicial, le Ejecutiva y la Legislativa. Con este principio se persigue evitar la concentración de poderes en una sola rama de gobierno, o el abuso de poder por parte de una de ellas; establecer un sistema de pesos y contra pesos que mantenga el equilibrio en el manejo del poder y asegurar una eficiente interacción entre las tres ramas gubernamentales.[47] El principio aludido no implica que las diferentes ramas del Gobierno deban mantenerse absolutamente separadas en todo momento ni que funcionen en "el vacío independientemente de las otras".[48] Puede existir un grado de interrelación entre ellas, siempre y cuando se mantenga íntegra la autoridad de cada una de ellas. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones.

---

[47] Sánchez v. Secretario de Justicia res. el 28 de junio de 2002, 2002 T.S.P.R. 98, 157 D.P.R.___, (2002) J.T.S. 105; Pueblo v. Santiago Feliciano 139 D.P.R. 360, 419-420 (1995); Noriega v. Hernández Colón, 135 D.P.R. 406 (1994); P.I.P. v. C.E.E., 120 D.P.R. 580, 611 (1988); Silva v. Hernández Agosto, 118 D.P.R. 45, 47 (1986).

[48] Pueblo v. Santiago Feliciano, *supra*; Noriega v. Hernández, Colón, *supra*.

Para ello la relación entre los poderes del Gobierno debe ser dinámica y armoniosa.[49] **Para decidir si alguna disposición estatutaria viola el principio de la separación de poderes, debe determinarse si la limitación de facultades que dispone concentra indebidamente el poder gubernamental en una de las tres ramas o si disminuye la independencia de alguna de ellas en el fiel desempeño de sus funciones.[50]**

**PODERES DEL GOBERNADOR(A) DE PUERTO RICO**

El Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, dispone lo siguiente:

**Facultades y deberes del Gobernador**

Los **deberes, funciones y atribuciones** del Gobernador serán:

**Cumplir y hacer cumplir las leyes.**

...

**Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado.** El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. **Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria.**

...

---

[49] Pueblo v. Santiago Feliciano, *supra*, pág.420; Silva v. Hernández Agosto, *supra*, pág. 47.

[50] Pueblo v. Santiago Feliciano, *supra*.

> Ser comandante en jefe de la milicia. Llamar la milicia y conocer el *posse comittatus* a fin de impedir o suprimir cualquier grave perturbación del orden público, rebelión o invasión.
>
> **Ejercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley**. (Énfasis suplido).

El Gobernador de Puerto Rico tiene la facultad para ejercer la dirección general de la administración pública con el claro entendimiento de que comprende la **"supervisión e inspección"** de los departamentos y agencias de gobierno, así como **de las corporaciones públicas y de las entidades autónomas creadas por ley**.[51]

Una Orden Ejecutiva encuentra apoyo legal en la facultad general del Primer Ejecutivo(a) **de cumplir y hacer cumplir las leyes, vigilar y supervisar la conducta oficial de todos los funcionarios de la Rama Ejecutiva y de cuidar que cumplan con los deberes y las obligaciones de sus cargos a tenor con la ley**. Toda Orden Ejecutiva enmarca un mandato dirigido a los organismos gubernamentales de la Rama Ejecutiva, a tenor con la Constitución de Puerto Rico y el ordenamiento jurídico estatutario. No obstante, la facultad del Gobernador(a) de Puerto Rico para emitir Ordenes Ejecutivas no puede ejercerse en forma contraria o tener un efecto contrario a lo dispuesto por ley. Las Ordenes Ejecutivas, promulgadas a tenor con la autoridad concedida al Gobernador(a) de Puerto Rico, bien sea por la Constitución de Puerto Rico o por la Legislatura, tienen

---

[51] Diario de Sesiones, *supra*, pág. 2606.

efecto de ley.  Por el contrario no tienen efecto de ley las Ordenes Ejecutivas promulgadas por el Gobernador(a) de Puerto Rico en ausencia de autorización  concedida por la Constitución de Puerto Rico o por estatuto.[52]

En la delimitación de los organismos gubernamentales de la Rama Ejecutiva a los cuales va dirigida una Orden Ejecutiva no debe acudirse a ésta última, como primer recurso, cuando se quiera recabar la cooperación de las corporaciones públicas. [53] Las corporaciones públicas generalmente ejercen sus poderes por conducto de una Junta de Directores, que es el organismo autorizado  a decidir la acción a seguir  en  determinado asunto.   Una Orden Ejecutiva promulgada por el Gobernador(a) de Puerto Rico y dirigida a una corporación pública que la ley ha dispuesto su independencia y separación del resto de la Rama Ejecutiva claramente conflije con la autonomía operacional y funcional con la que el estatuto la invistió para lograr sus fines.[54]

Tres casos resueltos antes de la vigencia de la Constitución de Puerto Rico el 25 de julio de 1952 giran en torno al poder de destitución del Gobernador(a) de Puerto

---

[52] Op. Sec. Just. Núm. 1985-5.

[53] Íd. El Secretario de Justicia recomendó al Gobernador de Puerto Rico en esa ocasión que cuando el  Poder Ejecutivo interese recabar la cooperación de las corporaciones públicas en determinado asunto se le envíe un memorando o carta circular donde se les exhorte para que adopten determinada medida en beneficio del orden público.

[54] Íd., págs. 31-32.

Rico. Después del 1917 cuando se aprobó la Ley Jones por el Congreso de Estados Unidos el Poder Legislativo en Puerto Rico continuó sujeto y limitado por la concentración del poder del Gobernador(a) de Puerto Rico, y no a la dispersión juiciosa de naturaleza tripartita. Puerto Rico tenía una Rama Legislativa trunca; sin el poder de frenar eficazmente el poder del Gobernador(a) mediante la facultad de aprobar legislación a pesar de su veto. No puede afirmarse con rigor histórico que nuestro ordenamiento constitucional encarnaba en modo amplio la doctrina de la separación de poderes. Fue con la aprobación y vigencia de nuestra Constitución que logramos la encarnación en forma más amplia de la garantía de la libertad individual mediante la doctrina de la separación de poderes.[55]

No obstante, durante el período de 1917 al 1952, este Tribunal frenó consistentemente el poder de destitución del Gobernador de turno, nombrado por el Presidente de Estados Unidos, por actuaciones contrarias a normas estatutarias vigentes, aprobadas por la Asamblea Legislativa de Puerto Rico, y a derechos protegidos por la Constitución de Estados Unidos. Veamos.

En Jiménez v. Riley[56] este Tribunal le ordenó al Gobernador de Puerto Rico de entonces, honorable E. Mont. Riley, nombrado por el Presidente de Estados Unidos, a restituir a su cargo a un Juez Municipal destituido por él,

---

[55] Hernández Agosto v. López Nieves, supra, pág. 619.

[56] 30 D.P.R. 626 (1922).

sin formulación y notificación de cargos y celebración de audiencia. El Gobernador Riley destituyó al honorable Gustavo Jiménez Sicardó, Juez municipal, mediante carta del 16 de octubre de 1921, cuyo contenido reza de la forma siguiente:

> ... señor:
>
> __ Tiene ésta por objeto informarle que en esta fecha le he separado a usted del cargo de Juez Municipal de San Juan, en bien del servicio del Pueblo de Puerto Rico. Dicha separación tendrá efecto inmediatamente.
>
> De usted atentamente,
>
> (firmado)
> E. Mont Reily-Gobernador.

La norma estatutaria vigente para esa época disponía que los Jueces Municipales eran nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado por un término de cuatro (4) años sujeto a su destitución por el mismo funcionario, por justa causa. El Juez Jiménez Sicardó fue nombrado con el consejo y consentimiento del Senado, por el anterior Gobernador de Puerto Rico, honorable Arthur Yager, para el cargo de Juez Municipal del Distrito Judicial Municipal de San Juan, Sección Primera, por un término de cuatro(4) años. El Juez Jiménez Sicardó continuó desempeñando sus deberes oficiales hasta la fecha en que recibió la referida carta. El Juez Jiménez Sicardó alegó ante esta Curia que fue ilegal y arbitrariamente privado del ejercicio de su cargo en sus derechos inherentes sin que se le formularan cargos de ninguna

especie, sin notificación de los mismos, ni brindarle oportunidad para defenderse o presentar pruebas o ser confrontado o repreguntar a los testigos utilizados en su contra, sin justa causa y sin el debido proceso de ley, en abierta y flagrante violación de la ley local de 1904 que creó el cargo de Juez Municipal, enmendada en el año 1905, y a la enmienda catorce (14) de la Constitución de Estados Unidos.

Este Tribunal ordenó al entonces Gobernador Reily a reponer al Juez Jiménez Sicardó en su cargo. Expresó lo siguiente:

> **No es nuestro ánimo intervenir, ni tenemos por ahora la idea de hacer una revisión judicial de la amplia discreción que tiene el ejecutivo al considerar la cuestión de destitución y al apreciar la prueba, después de una notificación y audiencia. Dar tal notificación y la oportunidad de defenderse no es una gran molestia, ni de acuerdo con las anteriores decisiones de esta corte puede considerarse que siquiera equivale a una gran inconveniencia.**
> Asumiendo, como lo hacemos, que existe justo motivo que sirve de base a la pretendida destitución en este caso, el cumplimiento con la ley puede aparecer que es una mera formalidad. Pero es una formalidad que una vez invocada no puede ser desatendida o ignorada. **En su fin y en realidad no tiene nada de rutinario sino que es un principio vivificante de suma importancia.**[57] (Énfasis suplido).

---

[57] Íd., págs. 726,727-728.

En <u>Romero Moreno v. Gore, Gobernador</u>[58] se resolvió que un ingeniero de la Comisión de Servicio Público que ocupaba una plaza dentro del Servicio Civil Clasificado no podía ser separado o despedido, salvo por causa justificada, previa formulación de cargos y oportunidad de ser oído. Concluyó este Tribunal que el honorable Robert H. Gore, entonces Gobernador de Puerto Rico, nombrado por el Presidente de Estados Unidos, había despedido a dicho funcionario en forma arbitraria, por razones políticas.

El señor Antonio Romero Moreno pertenecía al Servicio Civil de Puerto Rico desde el 10 de septiembre de 1917, que estaba comprendido en el servicio clasificado por nombramiento de ingeniero, extendido por la Comisión de Servicio Público el 1 de julio de 1921. Dicho cargo estaba autorizado y provisto por estatuto por la Asamblea Legislativa de Puerto Rico. El 18 de octubre de 1933 el señor Romero Moreno recibió una carta que reza de la forma siguiente:

"Sr. Antonio S. Romero, Ingeniero,

Comisión de Servicio Público,
San Juan, P.R.

Estimado Sr. Romero:

El Gobernador de Puerto Rico ha dirigido al Presidente de la Comisión de Servicio Público con fecha 16 del corriente una carta que dice así:

´Estoy interesado en reducir en todo lo posible cualquiera y todo gasto que no sea absolutamente esencial para el

---

[58] 46 D.P.R. 408 (1934).

desenvolvimiento adecuado de los negocios gubernativos.

´Como cuestión de economía administrativa considero necesario abolir los cargos de ingenieros de la Comisión de Servicio Público y en lo sucesivo esta labor será realizada por ingenieros del Departamento del Interior.

´Por consiguiente queda usted notificado de que para tener efecto en noviembre primero todo trabajo de ingeniería requerido por la Comisión de Servicio Público será asignado al Departamento del Interior, eliminando de esta suerte la necesidad de emplear ingenieros por la Comisión de Servicio Público y por la presente se le ordena eliminar en esa fecha los siguientes cargos en el presupuesto de la Comisión de Servicio Público:

1 ingeniero-------------------$3,800

1 ingeniero(electricista)-------2,700.`

Como es usted uno de los ingenieros mencionados en dicha carta, sirve ésta para notificarle que en y después de noviembre primero su cargo quedará abolido y sus servicios no se requerirán por más tiempo.

Véome obligado a esto cumpliendo las instrucciones contenidas en la carta del Gobernador arriba transcrita.

Atentamente,

(Fdo.)Eugenio D. Delgado,
Presidente Pro-Tempore."[59]

El señor Romero Moreno alegó ante este Tribunal que la acción y medida adoptada por el Gobernador Gore aboliendo el cargo que él ocupaba en la Comisión de Servicio Público montaba a su destitución y separación del mismo, y respondía a un plan preconcebido, preanunciado públicamente y puesto

---

[59] Íd., págs. 410-411.

en práctica más tarde por el referido funcionario de destituir de sus cargos a todos los funcionarios y empleados que pertenecen al partido político del cual él era miembro. Resolvimos que cuando el Gobernador de Puerto Rico actuaba dentro de sus atribuciones estaba fuera del alcance de los tribunales. No obstante, cuando violaba las disposiciones de una ley e infringía derechos privados, estaba sujeto a remedios judiciales al igual que cualquier otra persona. Ordenamos la reposición del señor Romero Moreno a su cargo, y expresamos lo siguiente:

> Se atribuye por último al Gobernador un plan preconcebido de destituir a todos los funcionarios y empleados pertenecientes al partido del cual es miembro el peticionario, quien está afiliado al Partido Liberal. Es un hecho admitido por las partes que el Sr. Romero pertenece al Servicio Civil Clasificado. **De acuerdo con la sección 6 de la Ley de Servicio Civil, aprobada en 1931, el peticionario únicamente puede ser separado de su cargo de conformidad con lo dispuesto en la ley. Ninguna persona que ocupe una plaza o destino en el Servicio Civil Clasificado será separado o despedido, salvo por causas justificadas y previa formulación de cargos, y no antes de dársele oportunidad para ser oído en defensa propia. La ley dispone la reposición de un funcionario o empleado separado en caso de que previa audiencia, resultare que la separación se debió a razones de orden político o religioso.**

> El inciso 18 de la sección 2ª. de nuestra Carta Orgánica dispone que no exigirá como condición para desempeñar cualquier cargo o posición de confianza en el Gobierno de Puerto Rico, ningún otro requisito político o religioso que un juramento de defender la Constitución de los Estados Unidos y las leyes de Puerto Rico.

...

En vista de la prueba practicada, que no ha sido contradicha, dudamos mucho de que el Gobernador Robert H. Gore decretara la abolición del cargo del peticionario por razones de economía. En la conferencia en que el Gobernador Gore solicitó del Sr. Muñoz que pidiese la renuncia a Romero no surge el argumento de la economía. En la entrevista celebrada con el Sr. Delgado el Gobernador se extraña de que no se le haya pedido la renuncia a Romero y ratifica su propósito de que así se haga, sin mencionar al otro ingeniero cuyo cargo aparece también abolido en la carta posterior del Gobernador. En ninguna de estas conferencias se habla de abolir cargo alguno. **Siempre se insiste en la renuncia.** La razón económica no se menciona en ningún sentido. **Por el contrario, cuando el Gobernador habla con el Sr. Muñoz, le dice que en la comisión hay dos ingenieros liberales y quiere que no haya uno que sea liberal, e inmediatamente urge que se le pida la renuncia al Sr. Romero.** En ningún momento el demandado Robert H. Gore habla de abolir los cargos de ingenieros de la Comisión. **Su atención está fija en Romero.** Es en la carta dirigida al Presidente de la Comisión de Servicio Público donde surge por primera vez el argumento de la economía. **En esta carta el Gobernador silencia la idea de la renuncia y adopta la medida radical de abolir los cargos de ingenieros de la Comisión.** Si el elemento de la economía hubiese jugado algún papel en la actuación del Gobernador, es natural que se hubiese manifestado en alguna de estas entrevistas que precedieron a la carta en cuestión. Por el contrario, lejos de surgir la razón económica como elemento básico de la conducta del Gobernador, **se solicita y se insiste exclusivamente en la renuncia del Sr. Romero.** No creemos que el Gobernador se basara en ninguna medida de interés público para decretar la abolición del cargo del peticionario.

> **La evidencia aportada tiende a demostrar que el Gobernador actuó en este caso movido por razones de índole política y no de carácter económico y que no medió buena fe al decretarse la abolición del cargo del peticionario.** (Énfasis suplido).[60]

En <u>Abella Blanco v. Piñero, Gobernador</u>[61] determinamos que aunque el honorable Rexford Guy Tugwell, Gobernador de Puerto Rico, nombrado por el Presidente de Estados Unidos, destituyó al licenciado Luis Abella Blanco, Registrador de la Propiedad, Sección de Caguas de su cargo, mediante formulación de cargos y celebración de una audiencia, no había cumplido con las disposiciones de una ley especial que especificaba la razón o motivo por la que dichos funcionarios podían ser destituidos. Allí expresamos lo siguiente:

> ...sostuvo el Registrador en la corte a *quo* y arguye en este Tribunal, que el Gobernador carece de facultad para destituirlo en el presente caso, e invoca las secciones 28 y 30 de la citada Ley que dicen:
>
> "Sección 28.–A los Registradores de la Propiedad convictos de haber violado en todo o en parte las disposiciones de esta Ley les será impuesta una multa de $100 (cien dollars) a $200 (doscientos dollars) por la primera infracción, de $200 (doscientos dollars) a $500 (quinientos dollars) por la segunda y se les separará de su cargo si cometen una tercera".
>
> "Sección 30.–El Gobernador de Puerto Rico ordenará la separación de cualquier Registrador *que con arreglo a las disposiciones de la presente* se haya

---

[60] Íd., págs. 423-424,427-428.

[61] 66 D.P.R. 690 (1946).

hecho acreedor a ser separado de su cargo." (Bastardillas nuestras).

**El Gobernador acepta que si él hubiera seguido el procedimiento prescrito en la Ley Asignando Sueldos a los Registradores y para otros fines, no hubiera podido destituir al Registrador hasta que no existiera la tercer convicción; pero arguye que independientemente de esa ley especial, puede destituirlo de conformidad con el art. 53 del Código Político, siempre que se formule cargos y le dé oportunidad de ser oído en su defensa.**

La Ley Asignando Sueldos a los Registradores, etc. es de carácter especial y trata exclusivamente de los registradores de la propiedad. En su art. 28 esa Ley, como hemos visto, expresamente prescribe el castigo que puede imponerse por infracción a la misma. Esas y no otras, son las únicas penas prescritas por el legislador para tales casos. **Es claro que el Gobernador no puede seguir a su antojo el procedimiento que siguió en este caso y de ese modo convertir en letra muerta las disposiciones de la ley especial. Mientras esa ley esté en vigor, los registradores tienen derecho a no ser destituídos por violación a la misma, a menos que hayan sido convictos de una tercera infracción.**

**El art. 53 del Código Político es una ley de carácter general y existiendo una de carácter especial aplicable a los registradores, éstos no deben considerarse comprendidos dentro de la ley general cuando infrinjan las disposiciones de la ley especial. De igual modo es inaplicable el citado art. 53 a aquellos funcionario para cuya remoción se ha provisto por ley un procedimiento especial.**

La contención del Gobernador de que su facultad para destituir al apelante surge también del art. 308 de la Ley Hipotecaria, es claramente insostenible. El art. 308, como todos

los comprendidos en el Título X de la
Ley Hipotecaria-que comprende los
artículos 297 al 312, inclusive- ha
sido sustituído por la Ley Asignando
Sueldos a los Registradores y para
otros fines, y por consiguiente no está
en vigor.

**Sin prejuzgar los méritos del caso,
e imputándose al peticionario una
primera infracción a la Ley Asignando
Sueldos a los Registradores, etc. sin
haberse seguido el procedimiento
prescrito por dicha ley,** *procede revocar
la sentencia apelada y en su lugar
dictar la que debió haber dictado la
corte inferior, es decir, expedir un
auto perentorio de mandamus dirigido al
Hon. Jesús T. Piñero, Gobernador de
Puerto Rico, como sucesor de Rexford
G.Tugwell, ordenándole que en su
expresado carácter de Gobernador de
Puerto Rico proceda a reponer a Luis
Abella Blanco en el cargo de Registrador
de la Propiedad de Caguas con efecto
retroactivo al 17 de agosto de 1945,
fecha en que fué [sic] suspendido de
empleo y sueldo, y que se sirva además
ordenar el pago de sus sueldos
devengados desde la fecha de su
suspensión de empleo y sueldo a razón de
$3,500 anuales.*[62] *(Énfasis suplido).*

En Puerto Rico no existe un precedente claro dispuesto por esta Curia en su jurisprudencia que nos permita apoyarnos para contestar **en forma directa y específica** la interrogante que nos dirige la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico a través del referido recurso de certificación interjurisdiccional. No obstante, nuestra Asamblea Constituyente utilizó como modelo la Constitución de Estados Unidos. El Tribunal Supremo de Estados Unidos ha emitido amplia jurisprudencia

---

[62] Íd., págs. 691-693.

interpretando la cláusula contenida en la Constitución de Estados Unidos, similar a la contenida en el Artículo IV, Sección 4 de la nuestra.

El Artículo II Sección 1 y Sección 2 de la Constitución de Estados Unidos[63] dispone lo siguiente:

> Sección 1. **El Poder Ejecutivo residirá en el Presidente de los Estados Unidos de América.**
>
> ...
>
> Sección 2. El presidente será jefe supremo del ejército y de la armada de los Estados Unidos, así como de la milicia de los distintos estados cuando ésta fuere llamada al servicio activo de la Nación.
>
> Con el consejo y consentimiento del Senado tendrá poder para celebrar tratados, siempre que en ellos concurran las dos terceras partes de los senadores presentes. **Asimismo, con el consejo y consentimiento del Senado, nombrará embajadores, otros ministros y cónsules públicos, los jueces del Tribunal Supremo y todos los demás funcionarios de los Estados Unidos cuyos cargos se establezcan por ley y cuyos nombramientos esta Constitución no prescriba. Pero el Congreso podrá por ley, confiar el nombramiento de aquellos funcionarios subalternos que creyere prudente, al presidente únicamente, a los tribunales de justicia o a los jefes de departamento.**
>
> El presidente tendrá poder para cubrir todas las vacantes que ocurrieran durante el receso del Senado, extendiendo nombramientos que expirarán al finalizar la próxima sesión del Senado. (Énfasis suplido).

---

[63] Constitución de Estados Unidos, L.P.R.A. Tomo 1, ed. 1999, págs. 170-172.

En Myers v. United States[64] el Tribunal Supremo de
Estados Unidos resolvió el 25 de octubre de 1926 que el
Congreso no podía privar al Presidente de su poder para
destituir a un funcionario de la Rama Ejecutiva nombrado por
el Primer Ejecutivo. **Concluyó que el poder de destitución
es tan parte del Poder Ejecutivo como el poder de
nombramiento. Apoyó tal conclusión en la obligación del
Presidente "de hacer cumplir las leyes".** En Myers, *supra*,
la Opinión del Tribunal fue suscrita por el honorable
William Taft, Juez Presidente del Tribunal Supremo de
Estados Unidos, quien había sido previamente Presidente de
Estados Unidos. Expresó en su Opinión el Juez Presidente,
señor Taft, sin que los hechos del caso lo requirieran, que
el Presidente de Estados Unidos tenía poder inherente para
destituir aún a aquellos funcionarios que ejercieran
funciones cuasijudiciales. La decisión de Myers, *supra*,
fue interpretada por muchas personas en el sentido de que
facultaba al Presidente a destituir funcionarios
independientemente del tipo de funciones que ejerciera y de
las restricciones que el Congreso pudiera imponerle.[65]

El señor Frank S. Myers fue nombrado el 21 de julio de
1917 por el Presidente de Estados Unidos con el consejo y
consentimiento del Senado para ocupar el puesto de

---

[64] 272 U.S. 52 (1926).

[65] R. Serrano Geyls, Derecho Constitucional de Estados Unidos
y Puerto Rico, San Juan, Universidad Interamericana de
Puerto Rico, 1997, Vol. I, pág. 602.

"postmaster" de primera clase en Portland, Or., por el término de cuatro (4) años. El 20 de enero de 1920 la renuncia del señor Myers fue solicitada. Éste se negó a renunciar. El 2 de febrero de 1920 el señor Myers fue removido de su puesto mediante orden del "Postmaster General" actuando en representación y bajo la autoridad del Presidente de Estados Unidos. El estatuto que regulaba para esa época la mencionada situación disponía que los "postmasters" de primera, segunda y tercera clase debían ser nombrados **y removidos por el Presidente de Estados Unidos con el consejo y consentimiento del Senado.** El Senado de Estados Unidos no había consentido a la remoción del señor Myers de su puesto durante su término de cuatro (4) años. Por tal motivo el señor Myers solicitó del Tribunal que ordenara el pago de su salario por el remanente del término de cuatro(4) años. El Poder Ejecutivo arguyó que el requisito estatutario que exigía el consejo y el consentimiento del Senado para la remoción de un funcionario ejecutivo era inválido porque bajo el Artículo II de la Constitución de Estados Unidos, *supra*, el poder de remoción del Presidente de los funcionarios del ejecutivo nombrados por él, con el consejo y consentimiento del Senado, es total y completo, sin necesidad del consentimiento del Senado. El Tribunal Supremo de Estados Unidos concluyó que la disposición estatutaria aprobada por el Congreso que restringía el poder del Presidente de remoción de los "postmasters" de primera clase, al sujetar

tal poder al consejo y consentimiento del Senado, era inválida por ser violatoria al Artículo II de la Constitución de Estados Unidos, *supra*.

Nueve (9) años más tarde el Tribunal Supremo de Estados Unidos restringió considerablemente el alcance de Myers v. United States, supra. El 27 de mayo de 1935 en el caso de Humphrey's Ek´r v. United States,[66] el más Alto Foro limitó lo resuelto en Myers, *supra*, a aquellos casos en que estuviesen involucrados "funcionarios puramente ejecutivos" y rechazó explícitamente lo allí expresado sobre los cuerpos de naturaleza cuasijudicial.[67]

En 1933 el Presidente Franklin Delano Roosevelt destituyó a un miembro del Federal Trade Commission alegando la necesidad de que dicho organismo estuviera integrado por personas de su "propia selección" que disfrutaran de su "plena confianza". El Federal Trade Commission estaba investido de amplios poderes cuasilegislativos y cuasijudiciales. La ley habilitadora del referido organismo dispuso que sus miembros servirían a término y que sólo podrían ser destituidos por las razones allí enumeradas. Destacó el Tribunal Supremo de Estados Unidos que al crear el Federal Trade Commission el Congreso había querido crear un organismo **independiente de la autoridad ejecutiva**", excepto en la designación de sus miembros. Expresó, sobre este asunto, lo siguiente: **"The**

---

[66] 295 U.S. 602 (1935).

[67] Serrano Geyls, op.cit., pág. 606.

**Authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropiate [sic] incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime".** [68] (Énfasis suplido).

La Convención Constituyente de Puerto Rico consideró al redactar el Artículo IV, sección 4 de la Constitución de Puerto Rico, *supra,* los casos de Myers, *supra*, y de Humphrey's Executor, *supra*, resueltos por el Tribunal Supremo de Estados Unidos. La intención de nuestra Asamblea Constituyente, sobre ese extremo, que emana del Diario de Sesiones, reza de la forma siguiente:

> La primera controversia judicial que surge en torno al problema, surge cuando un presidente de los Estados Unidos destituye a un administrador de correos. Este lleva su caso a las cortes, y es finalmente resuelto por el Tribunal Supremo de los Estados, por resolución de su juez presidente entonces, señor Taft; y [éste es el caso] que se conoce en la jurisprudencia sobre este particular, como el caso **Myers** . El caso **Myers** sostuvo que la Constitución de los Estados Unidos, al concederle al Presidente la facultad de nombramiento, le concedió como ingrediente indispensable de esa facultad, la facultad de destitución en cualquier momento; y que ninguna disposición del Congreso de los Estados Unidos podía fijarle término a un funcionario del [poder] ejecutivo que fuese válido, contra la facultad

---

[68] Íd., págs. 607-608.

absoluta del [jefe] ejecutivo de removerlo en cualquier momento.

**La decisión al caso de Myers, que fue bastante criticada por los comentaristas, subsistió, sin embargo, hasta el año 1935 en que se produce la segunda decisión judicial sobre el problema; cuando el Presidente Franklin D. Roosevelt destituyó por carta al Presidente de la *Federal Trade Commission*. El cargo de Presidente del *Federal Trade Commission*, había sido creado mediante estatuto, y se le había fijado un término de 7 años.** Al poco tiempo de estar el Presidente Roosevelt en Casa Blanca, tuvo una controversia con Mr. Humphreys, que era el Presidente del *Federal Trade Commission.* Como resultado de esa controversia, el Presidente Roosevelt le escribió una carta diciéndole que era evidente que sus ideas y política pública en materia de comercio no coincidían, y que toda vez que él era el jefe del [poder] ejecutivo le suplicaba le enviase su renuncia. El Presidente de la Comisión, se negó a enviar la renuncia, y al día siguiente el Presidente Roosevelt le escribió una carta separándolo del cargo.

Así fue que la situación llegó a la corte, **y es en esa fecha en que se modifica la regla absoluta, en el caso de Myers, y se decide que la Constitución de los Estados Unidos, al guardar silencio sobre el término de duración de los cargos de los miembros del Gabinete, y al no autorizar específicamente al Congreso para legislar sobre la materia, había procedido sobre la base, de que siendo esos cargos de naturaleza tal que pertenecían a la rama ejecutiva, en su propia esencia, el poder del Presidente de nombrar y destituir en esos cargos era absoluto;** y que en eso se confirmaba la doctrina del caso de **Myers.**

**Pero señaló el caso de Humphreys que la regla no es así, cuando se trata**

de nombramientos que el Presidente hace, pero que, en primer lugar, no son de la esencia misma del poder ejecutivo, o son nombramientos que hace para personas que desempeñan funciones en una de las otras dos ramas de gobierno.  Bien sea en la rama legislativa, o en la rama judicial, o en los organismos de  carácter cuasi judicial.  O sea, que la facultad del Presidente de los Estados Unidos para nombrar una persona en la rama legislativa, [69] que le fuera señalada por ley, tiene que regirse con todas las limitaciones que la ley le imponga.  Y si le impone un término de tiempo, ese término  de tiempo es superior al poder del [jefe] ejecutivo al hacer la designación.

Si la ley le concede al Presidente de los Estados Unidos la facultad de hacer un nombramiento de carácter judicial, o para una junta u organismo de carácter cuasi judicial, y le fija un término, entonces el término es obligatorio para el Presidente, y no pude disponer del cargo sin sujeción a lo que la ley disponga en cuanto al término.  Que donde es claro, que el Congreso no puede intervenir para fijarle términos de duración a los cargos, es en relación con aquellos, que por ser de naturaleza esencialmente de la rama judicial la constitución no les dispuso término, y, por consecuencia, el poder de remover estaba implícito en la facultad de nombrar.

Señor Presidente y compañeros delegados:  El propósito de esta enmienda que tengo ahora el honor de proponerles, es sencillamente que adoptemos la manera de bregar con el asunto que establece la Constitución de los Estados Unidos, con la interpretación judicial de la misma en la forma en que la hemos expuesto.

---

[69] Probablemente debe leer "ejecutiva"; 3 Diario de Sesiones de la Convención Constituyente 2270 (1961).

**En otras palabras: Que meramente consignamos la facultad del Gobernador para nombrar los secretarios de gobierno. Dejamos establecido también en otra parte de esta constitución, que los secretarios de gobierno asistirán al Gobernador en el desempeño y en el ejercicio del poder ejecutivo. Y que, en cuanto a los departamentos de gobierno, meramente consignemos la facultad de la Asamblea Legislativa para crear, consolidar, reorganizar y determinar las funciones de los departamentos. Y que, nada digamos en cuanto al poder para determinar las funciones y el término de duración de los cargos de los secretarios propiamente dichos, adoptando así la doctrina de la Constitución de los Estados Unidos que acabo de exponer ante ustedes.**

Sr. REYES DELGADO: Para una pregunta. Vuestra explicación de lo que provee la Constitución de los Estados Unidos y cómo ha sido interpretada, a mi juicio ha estado tan sencillamente expuesta, que hasta un mocetón de octavo grado la entiende. **Ahora, yo quisiera oir a Su Señoría sobre la bondad de ese sistema para determinar si en efecto conviene adoptarlo en Puerto Rico.**

Sr. GUTIERREZ FRANQUI: Bueno, en primer lugar quiero recordar que empecé mis palabras diciendo que todo este estudio en torno a este problema, surgió cuando al leer este lenguaje, nos dimos cuenta de que según estaba esto aquí, y establecido en otro sitio el poder de la Asamblea Legislativa para aprobar leyes por encima del veto del Gobernador, claramente la constitución permitía la posibilidad de que una asamblea legislativa estuviera cambiándole el término a los secretarios del gobierno, reduciéndoselos, aumentándoselos, y en esa forma interviniendo con la creación y organización del departamento ejecutivo del gobierno.

Claro que no debemos, y creo que es función nuestra, escribir una constitución siempre a base de los conflictos que puedan existir entre los distintos poderes del gobierno. Nosotros estamos escribiendo una constitución que cuando ha de funcionar, será a base de la armonía y la cooperación entre los distintos departamentos del gobierno, a eso se debe propender, y en eso debemos confiar todos nosotros. Pero sería muy fácil para una [Asamblea] Legislativa antagónica al Gobernador, crearle una situación imposible de Gabinete, reduciéndole a un año el término de duración del cargo de secretarios de gobierno, y obligando a ese Gobernador cada año a someter a su consideración la designación de nuevos secretarios de gobierno. Podría crearle la misma situación variándole las funciones.

**De manera que yo entiendo que la experiencia de la disposición constitucional en la Constitución de los Estados Unidos, la forma en que ha funcionado esta parte del [poder] ejecutivo del gobierno federal, y el peligro que hemos apuntado de hacer una delegación de la Asamblea legislativa, claramente indican la conveniencia de adoptar la doctrina constitucional americana sobre el particular[70].**

En Wiener v. United States[71] resuelto el 30 de junio de 1958 el Tribunal Supremo de Estados Unidos se enfrentó a una variante del problema planteado en Humphrey´s Executor, *supra*. La controversia en ese caso giraba sobre la destitución, por el Presidente Dwight Eisenhower, de un miembro de la Comisión de Reclamaciones de Guerra creada por el Congreso de Estados Unidos para "recibir y

---

[70] Íd., págs. 2268–2271 (1961).

[71] 357 U.S. 349 (1958).

adjudicar" solicitudes de compensación presentadas por personas que hubieran sufrido daños físicos o personales durante la Segunda Guerra Mundial. La incumbencia de los comisionados terminaría cuando el organismo concluyera su encomienda. El Congreso nada dispuso sobre la destitución de sus miembros.

El 8 de junio de 1950 el Presidente Harry Truman nombró al señor Myron Wiener miembro de la Comisión de Reclamaciones de Guerra. El 10 de diciembre de 1953 el Presidente Eisenhower lo removió de su cargo, después de solicitarle su renuncia, porque él prefería en ese organismo personas de su propia selección. El señor Wiener impugnó tal actuación en los Tribunales. El Tribunal Supremo de Estados Unidos concluyó que debido a "el carácter intrínsecamente judicial" de las tareas de la Comisión de Reclamaciones de Guerra el Congreso había tenido la intención de establecer un organismo independiente del Poder Ejecutivo. El Tribunal Supremo expresó lo siguiente:

> For such is this case. We have not a removal for cause involving the rectitude of a member of an adjudicatory body, nor even a suspensory removal until the Senate could act upon it by confirming the appointment of a new Commissioner or otherwise dealing with the matter. **Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to**

> **the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of <u>Humphrey´s Executor</u>, in its explicit language as well as its implications, precludes such a claim.** (Énfasis suplido)[72].

En <u>Morrison v. Olson</u>[73] el Tribunal Supremo de Estados Unidos evaluó, analizó y discutió la constitucionalidad de un estatuto aprobado por el Congreso llamado "Ethics in Government Act of 1978"[74] que estableció el sistema de nombramiento de fiscales especiales independientes por un tribunal federal especial, denominado "Special Division", compuesto por tres jueces de los distintos circuitos del Tribunal de Apelaciones Federal nombrados por el Juez Presidente del Tribunal Supremo Federal.[75]  Dicho estatuto dispuso que el poder de destitución de dichos fiscales especiales residía en la Rama Ejecutiva. El fiscal especial independiente podía ser removido de su cargo por el Secretario de Justicia de Estados Unidos sólo por justa causa.  Tal controversia emergió como consecuencia de una investigación practicada por la Comisión de lo Jurídico de la Cámara de Representantes de Estados Unidos (House Judiciary Committee) sobre el rol del Departamento de Justicia   Federal en una  controversia entre ese cuerpo

---

[72] Íd., págs. 356.

[73] 108 S. Ct. 2597 (1988).

[74] 28 U.S.C.A. sec. 49, 591 <u>et. seq</u>.

[75] Serrano Geyls, <u>op.cit</u>, suplemento de 1989, pág.72.

legislativo y la Agencia de Protección Ambiental (Environmental Protection Agency) relacionada con el incumplimiento de esta última en producir ciertos documentos requeridos por la Cámara de Representantes mediante un *subpoena* emitido durante el curso de una investigación. Un informe de la Comisión de lo Jurídico de la Cámara de Representantes sugería que el señor Olson, oficial de la Oficina del Secretario de Justicia de Estados Unidos, había ofrecido falso testimonio durante el curso de una investigación practicada sobre la Agencia de Protección Ambiental y que otros dos (2) oficiales de esa oficina habían obstruido la investigación, evitando que se le entregara a dicha comisión legislativa determinados documentos. Una copia de dicho informe fue enviado al Secretario de Justicia de Estados Unidos con un requerimiento para que solicitara la designación, a tenor con el referido estatuto, de un fiscal especial independiente para que investigara las alegaciones contra esos oficiales. La fiscal especial independiente fue designada por el referido tribunal federal especial, a tenor con el estatuto, con respecto a la investigación del señor Olson solamente. Se le concedió facultad para investigar si el testimonio del señor Olson ante la comisión legislativa violó la norma estatutaria federal, y para presentar cargos contra esa persona de haber alguna violación de ley. Posteriormente surgió una disputa entre la fiscal especial independiente y el Secretario de

Justicia de Estados Unidos sobre la jurisdicción del primero. El tribunal federal especial dispuso que la facultad concedida a la fiscal especial independiente era suficientemente amplia como para investigar si el señor Olson había conspirado con otros oficiales del Departamento de Justicia de Estados Unidos para obstruir la investigación legislativa practicada sobre la Agencia de Protección Ambiental. La señora Morrison, fiscal especial independiente designada, solicitó y obtuvo del Gran Jurado Federal la emisión de subpoenas contra el señor Olson y los otros dos (2) oficiales. Estos acudieron a la Corte de Distrito de Estados Unidos para impugnar los subpoenas emitidos planteando que el "Ethics in Government Act of 1978", *supra*, era inconstitucional y que la fiscal especial independiente carecía de autoridad para actuar.

El Tribunal Supremo de Estados Unidos mediante Opinión emitida por su Juez Presidente, señor Rehnquist, resolvió que el "Ethics in Government Act of 1978*", supra*, no viola la Cláusula de Nombramientos contenida en el Artículo II, Sección 2 de la Constitución de Estados Unidos*, supra*, ni el Artículo III de la misma, así como tampoco la autoridad concedida al Presidente por el referido Artículo II, según enmarcada en el principio de la separación de poderes. Resolvió que los fiscales especiales independientes son **"inferior officers"** cuyos nombramientos el Congreso de Estados Unidos puede por ley delegar al Presidente, los tribunales, o a los jefes de los departamentos del

ejecutivo, porque: (1) el Secretario de Justicia de Estados Unidos puede destituirlos con justa causa; (2) tienen facultad para desempeñar sólo funciones limitadas de investigar y acusar conforme con lo dispuesto por el tribunal federal especial (Special Division); y (3) sus cargos son temporeros, sujetos a la terminación de las labores específicas que se les asignen. Concluyó que la Cláusula de Nombramientos contenida en el Artículo II, Sección 2 de la Constitución de Estados Unidos, *supra*, no le prohíbe al Congreso colocar el poder de nombrar esos fiscales fuera de la Rama Ejecutiva, ya que ni su letra ni su historial proscriben los nombramientos "inter ramas", y la Rama Judicial, por razón de posibles conflictos de intereses dentro de la Rama Ejecutiva, es el cuerpo de gobierno más lógico para ubicar el poder de nombrar fiscales especiales independientes para investigar los más altos funcionarios de la Rama Ejecutiva. Concluyó, además, que dicho estatuto tampoco viola el Artículo III de la Constitución de Estados Unidos[76] que prohibe imponerle deberes ejecutivos o administrativos a los jueces federales. Apoyó su conclusión en que: (1) el poder concedido al tribunal federal especial emana de la referida Cláusula de Nombramientos la cual es independiente de los dispuesto por el Artículo III de la Constitución de Estados Unidos, *supra*, y dicho poder incluye la facultad de determinar el alcance de la jurisdicción del fiscal

---

[76] Constitución de Estados Unidos, *supra*, págs. 173-174.

especial independiente designado; (2) el Artículo III de la Constitución de Estados Unidos, *supra*, no le impide al Congreso facultar al mencionado tribunal federal especial a "recibir" informes de los fiscales especiales independientes designados por ese organismo (aunque no aprobarlos o actuar a base de ellos) **porque no apareja el poder de "supervisar" a esos funcionarios y por tanto, no limita la autoridad de la Rama Ejecutiva**; (3) el poder concedido al tribunal federal especial comprende el dar por finalizado el término de un fiscal especial independiente por éste haber terminado sus tareas; aunque tal facultad es de naturaleza "administrativa" no constituye una limitación judicial "significante" del poder ejecutivo o de la discreción del fiscal especial independiente que sirva de apoyo para sostener la invalidación de la ley bajo el Artículo III de la Constitución de Estados Unidos, *supra*, y (4) los poderes concedidos al tribunal federal especial no amenazan la imparcialidad o independencia de la Rama Judicial, porque ese organismo no puede revisar las actuaciones de los fiscales especiales independientes o del Secretario de Justicia de Estados Unidos, ni sus miembros pueden intervenir en ningún procedimiento que afecte un asunto en que estén involucrados esos funcionarios.[77]

El Tribunal Supremo de Estados Unidos expresó en la Opinión dictada en Morrison v. Olson, *supra*, lo siguiente:

> Apellees contend that ***Humphrey´s Executor*** and ***Wiener*** are distinguishable

---

[77] Serrano Geyls, op. cit, pág. 72.

from this case because they did not involved officials who performed a "core executive function". They argue that our decision in *Humphrey´s Executor* rests on a distinction between "purely executive" officials and officials who exercise "quasi-legislative" and "quasi-judicial" powers. In their view, when a "purely executive" official is involved, the governing precedent is *Myers,* not *Humphrey´s Executor.* And, under *Myers* the President must have absolute discretion to discharge "purely" executive officials at will…

**We undoubtedly did rely on the terms "quasi-legislative" and "quasi-judicial" to distinguish the officials involved in *Humphrey´s Executor* and *Wiener* from those in *Myers,* but our present considered view is that the determination of whether the Constitution allows Congress to impose a "good cause" type restriction on the President´s power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive". The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President´s exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II. *Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some "purely executive" officials who must be removable by the President at will if he is to be able to accomplish his constitutional role.**

At the other end of the spectrum from *Myers*, the characterization of the agencies in *Humphrey´s Executor* and *Wiener* as "quasi-legislative" or "quasi-judicial" in large part reflects our judgment that it was not essential to the President´s proper execution of his Article II powers that these

agencies be headed up by individuals who were removable at will. We do not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant. **But the real question is whether the removal restrictions are of such a nature that they impede the President´s ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.**

**Considering for the moment the "good cause" removal provision in isolation from the other parts of the Act at issue in this case, we cannot say that the imposition of a "good cause" standard for removal by itself unduly trammels on executive authority. There is no real dispute that the functions performed by the independent counsel are "executive" in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch. As we noted above, however, the independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority. Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out her duties under the Act, we simply do not see how the President´s need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.**

**Nor do we think that the "good cause" removal provision at issue here impermissibly burdens the President´s power to control or supervise the independent counsel, as an executive official, in the execution of her duties under the Act… Although we need not decide in this case exactly what is encompassed within the term "good cause" under the Act, the legislative**

> **history of the removal provision also
> makes clear that the Attorney General
> may remove an independent counsel for
> "misconduct".    Here,   as   with   the
> provision  of  the  Act  conferring  the
> appointment authority of the independent
> counsel   on   the   special   court,   the
> congressional determination to limit the
> removal  power  of  the  Attorney  General
> was essential, in the view of Congress,
> to establish the necessary  independence
> of the office.   We do not think that
> this limitation as it presently stands
> sufficiently  deprives  the  President  of
> control  over  the  independent  counsel  to
> interfere    impermissibly    with    his
> constitutional  obligation  to  ensure  the
> faithful execution of the laws.**[78]

El  Tribunal  Supremo  de  Estados  Unidos  atendió  y

resolvió,  además,  el  asunto  planteado  y  alegado  a  los

efectos  que  el  "Ethics  in  Government  Act  of  1978",  *supra*,

como  un  todo,  no  violaba  el  principio  de  separación  de

poderes  por  interferir  indebidamente  con  el  rol

constitucional  de  la  Rama  Ejecutiva.   Sobre  ese  extremo

expresó lo siguiente:

> **We   observe   first   that   this   case
> does not involve an attempt by Congress
> to   increase   its   own   powers   at   the
> expense   of   the   Executive   Branch.**
> Unlike  some  of  our  previous  cases,  most
> recently  *Bowsher  v.  Synar,*  this  case
> simply  does  not  pose  a  "dange[r]  of
> congressional  usurpation  of  Executive
> Branch  functions".  See  also  *INS  v.
> Chadha.*   Indeed,  with  the  exception  of
> the  power  of  impeachment  –which  applies
> to  all  officers  of  the   United  States–
> Congress  retained  for  itself  no  powers
> of   control   or   supervision   over   an
> independent   counsel.    The  Act  does
> empower  certain  members  of  Congress  to
> request  the   Attorney  General  to  apply
> for  the  appointment  of  an   independent

---

[78] <u>Morrison v. Olson</u>, *supra*, págs. 2618-2620.

counsel, but the Attorney General has no duty to comply with the request, although he must respond within a certain time limit. Other than that, Congress´ role under the Act is limited to receiving reports or other information and oversight of the independent counsel´s activities, §595(a) functions that we have recognized generally as being incidental to the legislative function of Congress…

**Similarly, we do not think that the Act works any *judicial* usurpation of properly executive functions. As should be apparent from our discussion of the Appointments Clause above, the power to appoint inferior officers such as independent counsels is not in itself an "executive" function in the constitutional sense, at least when Congress has exercised its power to vest the appointment of an inferior office in the "courts of Law".** We note nonetheless that under the Act the Special Division has no power to appoint an independent counsel *sua sponte;* it may only do so upon the specific request of the Attorney General, and the courts are specifically prevented from reviewing the Attorney General´s decision not to seek appointment. In addition, **once the court has appointed a counsel and defined her jurisdiction, it has no power to supervise or control the activities of the counsel… The Act does give a federal court the power to review the Attorney General´s decision to remove an independent counsel, but in our view this is a function that is well within the traditional power of the judiciary.**

**Finally, we do not think that the Act "impermissibly undermine[s]" the powers of the Executive Branch, or "disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions",** *Nixon v. Administrator of General Services,*

*supra.* **It is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity.** The Attorney General is not allowed to appoint the individual of his choice; he does not determine the counsel´s jurisdiction; and his power to remove a counsel is limited… **[T]he Attorney General retains the power to remove the counsel for "good cause", a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are "faithfully executed" by an independent counsel.** No independent counsel may be appointed without a specific request by the Attorney General, and the Attorney General´s decision not to request appointment if he finds "no reasonable grounds to believe that further investigation is warranted" is committed to his unreviewable discretion. **The Act thus gives the Executive a degree of control over the power to initiate an investigation by the independent counsel. In addition, the jurisdiction of the independent counsel is defined with reference to the facts submitted by the Attorney General, and once a counsel is appointed, the Act requires that the counsel abide by Justice Department policy unless it is not "possible" to do so. Notwithstanding the fact that the counsel is to some degree "independent" and free from Executive supervision to a greater extent than other federal prosecutors, in our view these features of the Act give the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties.**[79]

El Juez Asociado señor Scalia disintió. Concluyó que el "Ethics in Goverment Act of 1978", *supra*, es

---

[79] Íd., págs. 2621-2622.

inconstitucional porque el nombramiento de los fiscales especiales independientes sólo puede realizarse por el Poder Ejecutivo, con el consejo y consentimiento del Senado, a tenor con el Artículo II, Sección 2 de la Constitución de Estados Unidos, *supra,* por ser posiciones "puramente ejecutivas". Opinó que el Tribunal Supremo de Estados Unidos había cambiado la norma vigente desde Humphrey´s Executor, *supra*, a los efectos que el Congreso de Estados Unidos podía válidamente imponer al Poder Ejecutivo como limitación la demostración de justa causa para remover un oficial nombrado por esa rama de gobierno siempre y cuando no realizara funciones "puramente ejecutivas". Consideró que la norma establecida en el caso de Morrison v. Olson, *supra*, es demasiado amplia pues permite al Congreso de Estados Unidos limitar el poder del Presidente de remover un oficial de la Rama Ejecutiva, que ejerce funciones "puramente ejecutivas", mientras tal restricción no afecte la capacidad o habilidad, del Presidente de descargar su rol constitucional.

IV

¿Es el requisito de justa causa para la destitución por el Gobernador(a) de turno de un miembro no *ex officio* de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública dispuesto en el Artículo 3 de la Ley Número 216 de 12 de septiembre de 1996, *supra,* uno inválido por ser violatorio al principio de separación de poderes y al Artículo IV, Sección 4 de la Constitución de

Puerto Rico?, *supra.* La contestación es en la negativa. Tal requisito es uno válido.

La parte demandante ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico presentó su alegato el 26 de enero de 2004. Esa parte alega que el asunto objeto del recurso de certificación interjurisdiccional presentado tiene claros equivalentes en la Constitución de Estados Unidos, para cuya resolución es necesario acudir a las interpretaciones judiciales del Tribunal Supremo de Estados Unidos. Sostiene que no estamos ante un problema exclusivamente de derecho local sino ante uno que por el origen de las disposiciones de la Constitución de Puerto Rico aplicables es imprescindible recurrir al ordenamiento jurídico constitucional federal. Alega que no procede la expedición del auto de certificación interjurisdiccional solicitado, a tenor con las Regla 25 de nuestro Reglamento. No obstante, arguye que, en la alternativa que este Tribunal considere la expedición del auto solicitado, el estatuto local impugnado es válido frente a la Constitución de Puerto Rico por no limitar ni afectar de modo alguno el poder de nombramiento del Gobernador(a) de Puerto Rico, ni el principio de separación de poderes. Para sostener su posición acude a los desarrollos sobre el tema producidos en el Tribunal Supremo de Estados Unidos en los casos de Myers, *supra*; Humphrey´s Executor, *supra*; Wiener, *supra*, y Morrison, *supra*. Utilizando esos precedentes puntualiza que el

Congreso de Estados Unidos puede imponer válidamente restricciones al poder de destitución del Presidente en aquellos casos de **"funcionarios ejecutivos inferiores"**. Sostiene que en cuanto a otras posiciones dentro de la Rama Ejecutiva dependerá, a tenor con **Morrison**, *supra*, de un análisis de las funciones del funcionario y de si las restricciones al poder de destitución del Presidente impuestas por el Congreso **"...impede the President´s ability to perform his constitutional duty"**. Sostiene que cuando se trata de un **"funcionario ejecutivo principal" hay que evaluar las funciones del mismo versus las restricciones impuestas por el Congreso al poder de destitución del Presidente para determinar si impide o restringe en forma impermisible la habilidad de este último para desempeñar su rol constitucional.**

Arguye la referida parte que en <u>Morrison</u>, *supra*, se hizo claro, por el Tribunal Supremo de Estados Unidos, que el requisito estatutario de justa causa, como el allí establecido, no constituye una limitación a la autoridad del Presidente para hacer cumplir las leyes, pues no restringió en forma impermisible **su poder de supervisar al fiscal especial independiente como un "funcionario ejecutivo"**, en la ejecución de sus deberes, a tenor con la ley. Sostiene que en el caso de <u>Morrison</u>, *supra*, se dispuso que el poder de destitución del Presidente de un **"funcionario ejecutivo"** no le fue removido por el Congreso, evitando de esa forma que éste ejercitara su rol

constitucional de hacer cumplir las leyes a través de los **"funcionarios ejecutivos"**. Por el contrario, porque el fiscal especial independiente podía ser destituido por justa causa, el Presidente, a través del Secretario de Justicia de Estados Unidos, mantuvo autoridad amplia para asegurarse que el fiscal especial independiente desempeñara en forma competente sus deberes y responsabilidades, a tenor con las disposiciones de la ley.

Considera esa parte que los principios aplicables al asunto ante nos son los siguientes:

a.  La legislatura no puede abrogarse el poder de remoción del ejecutivo o el derecho de participar en el ejercicio de ese poder (Myers, *supra*). Pero sí puede imponer limitaciones a dicho poder aunque no pueda participar de la decisión de remoción (Wiener, *supra*; Morrison, *supra*) para asegurar cierto grado de independencia del funcionario ante el ejecutivo.

b.  El poder de remoción del ejecutivo no es absoluto, en cuanto ciertos funcionarios ejecutivos que requieren un grado de independencia del ejecutivo, como por ejemplo, aquellos con funciones cuasi-judiciales o cuasi-legislativas, el Poder Legislativo puede establecer términos y requisitos de justa causa para la remoción (Humphrey, *supra*; Wiener, *supra*).

c.  La determinación de si la Legislatura puede imponer un requisito de justa causa no depende de que un funcionario ejerza funciones puramente ejecutivas en contraposición a que ejerza funciones cuasi-judiciales o cuasi-legislativas, tampoco de que la posición sea una considerada "inferior", aunque en este último caso el poder de la Legislatura es claro (Morrison, *supra*).

    d. El factor determinante en la imposición de restricciones por la Legislatura al poder de remoción del gobernante es la limitación que esas restricciones tengan sobre la obligación de cumplir y hacer las leyes (<u>Morrison</u>, *supra*).

    e. Un requisito de justa causa no es una restricción excesiva del poder del gobernante pues éste retiene la capacidad de hacer cumplir las leyes si el funcionario no actúa de acuerdo a las mismas (<u>Morrison</u>, *supra*).

Expresa la referida parte que de una lectura del estatuto impugnado se desprende que **la Asamblea Legislativa no se abrogó ni participó del poder de remoción del Gobernador(a) de Puerto Rico bajo el estatuto impugnado.** El gobernante puede remover los miembros de la Junta, cuando exista justa causa, de manera similar a lo dispuesto en el caso de <u>Morrison</u>, *supra*. Si los miembros de la Junta no cumplen con los deberes y obligaciones dispuestos por la Ley Núm. 216, *supra*, o los desempeñan en una forma incompetente "la Gobernadora" puede removerlos por justa causa, sin tener que consultar al Poder Legislativo. Por lo que, la capacidad del Poder Ejecutivo de hacer cumplir las leyes permanece inalterada. Sostiene que la Legislatura no retuvo ningún poder de supervisión sobre la Corporación o su Junta, por lo que no hay ninguna violación a la separación de poderes.

Arguye esa parte que el requisito estatutario de justa causa para la remoción de los miembros no *ex officio* de la Junta deviene un requisito esencial para lograr hacer

realidad la autonomía de la Corporación. Sostiene que no es necesario recurrir a la autonomía de la Corporación y a que los miembros de la Junta tienen términos fijos para concluir que hay un requisito de justa causa, pues la Legislatura dispuso expresamente ese requisito. Alega que sería irracional sostener que existe un interés gubernamental apremiante contrario a lo establecido en el estatuto. Afirma que la inclusión de ese requisito y el énfasis en la autonomía otorgada a la Corporación parece apuntar a que el interés apremiante del Estado es alejarla de la política partidista. Arguye que si una administración de gobierno determinara que sus intereses son otros y que tiene un interés apremiante en utilizar criterios políticos para ocupar la posición de miembro no *ex officio* de la Junta, la Legislatura podía legislar nuevamente para eliminar el requisito de justa causa.

Solicita esa parte de esta Curia que no se expida el auto solicitado, o en la alternativa, de expedirse se sostenga la validez constitucional del estatuto.

El 20 de abril de 2004 se presentó ante nos el "Alegato Principal de los Demandados". Arguye esa parte que el proceso de transición entre el gobierno saliente y el entrante, acaecido a finales del año 2000 como resultado de las elecciones generales celebrada el 7 de noviembre de ese año, reveló que el Gobierno de Puerto Rico enfrentaba un alegado déficit presupuestario referente al año fiscal en curso, cuya magnitud se estimó en alrededor de

cuatrocientos sesenta millones de dólares ($460,000,000). La entonces Gobernadora de Puerto Rico estimó que tal situación presupuestaria requería la implantación de medidas que propiciaran el control y manejo adecuado de los recursos gubernamentales que condujeran a una pronta estabilización fiscal y funcional del gobierno. Concluyó, que para ello, resultaba imprescindible establecer un control **de las partidas presupuestarias relacionadas con nombramientos, con plazas vacantes, con contratos y gastos no vinculados al ofrecimiento de servicios directos a la ciudadanía**. En vista de ello "la Gobernadora" emitió la Orden Ejecutiva OE-2001-03 mediante la cual dispuso que ninguna agencia del Gobierno podía otorgar contratos de servicios profesionales o consultivos durante la vigencia de la misma, ya fueran contratos nuevos, o enmiendas a los existentes, sin la autorización escrita del Secretario de la Gobernación. La referida Orden Ejecutiva fue emitida con "carácter de urgencia" y para que entrara en vigor inmediatamente y aplicara a todo contrato o transacción que estuviese pendiente para su otorgamiento, a partir del 3 de enero de 2001. La parte demandada nos expresa que por sus términos claros la directriz ejecutiva de "la Gobernadora" aplicaba a la Corporación como una **"agencia del Gobierno de Puerto Rico"**. Afirma esa parte que la **Universidad de Puerto Rico** fue la única entidad gubernamental exceptuada de su aplicación, en atención a su autonomía fiscal.

La parte demandada ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico utilizó los precedentes federales para ilustrarnos sobre el asunto cuya certificación fue solicitada ante nos. Apoyó sus argumentos en los casos resueltos por el Tribunal Supremo de Estados Unidos de Myers, *supra*; Humphrey´s Executor, *supra*; Wiener, *supra*; y Morrison, *supra*. Concluye que en el ámbito federal Humphrey´s Executor, *supra,* y Wiener, *supra*, tienen vigencia hoy en día. **No obstante, sostiene, que el análisis sobre las funciones realizadas por el funcionario lo gobierna el principio de separación de poderes desde el caso de Morrison, *supra*.** Sostiene, además, que "...**la arquitectura constitucional de las tres ramas de gobierno plasmadas en la Constitución del Estado Libre Asociado incorporó el principio de separación de poderes adoptado por la Constitución de Estados Unidos**".

Arguye la referida parte, que el lenguaje propuesto por la Comisión de la Rama Ejecutiva de la Convención Constituyente que finalmente pasó a ser la Cláusula de Investidura del Poder Ejecutivo contenida en la Constitución de Puerto Rico no fue objeto de debates significativos. Nos expresa que la explicación para esto "...es sencilla cuando se integra como parte del análisis constitucional el contexto y los cambios históricos que ocurrieron inmediatamente antes de la Convención en cuanto a la conceptualización del ejercicio del poder ejecutivo". Sostiene que el hecho de que el Artículo IV de la

Constitución de Puerto Rico, *supra*, resultara **"el menos innovador"** de todos los demás responde simplemente a que la sociedad en general, y en especial los delegados de la Asamblea Constituyente estaban ya comprometidos con los valores, objetivos y modelos de un Poder Ejecutivo Unitario. Sostiene que los cambios sufridos a nivel local por el Poder Ejecutivo de 1949 a 1951, en vista de que el Congreso de Estados Unidos le permitió a Puerto Rico elegir en el 1948 su primer gobernador, **"se convalidaron sin hacerlos objeto de especial debate"**. Asegura que medió un "entendimiento" entre los delegados de la Convención Constituyente para incorporar el propósito de la legislación aprobada previamente a la Convención Constituyente, sobre la reorganización de la Rama Ejecutiva. Considera que la década entera de los años cuarenta del siglo veinte (XX), o al menos el período del 1949 al 1951, fue un **"período constitucional definitorio"** que pasó a formar parte de la propia Constitución de Puerto Rico, tal y como quedó redactada. Hace referencia a los debates de la Convención Constituyente sobre el texto y contenido del Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, que transcribimos previamente de su Diario de Sesiones. **Concluye que la Convención Constituyente de Puerto Rico adoptó la manera de atender y manejar el asunto que establece la Constitución de Estados Unidos, con las interpretaciones judiciales que existían a la fecha de sus de liberaciones**.

Arguye la referida parte demandada que mediante la Ley Núm. 216, *supra,* la Corporación quedó en el estado previo a la vigencia del mismo y "se rebautizó legislativamente" como una instrumentalidad independiente del Estado Libre Asociado de Puerto Rico bajo el nombre de Corporación de Puerto Rico para la Difusión Pública.  Sostiene que si bien el referido estatuto independizó a la Corporación de la Autoridad de Teléfonos y dispuso que las emisoras de radio y televisión del gobierno tendrían personalidad jurídica independiente y separada de cualquier otra entidad, agencia, departamento o instrumentalidad del Gobierno de Puerto Rico lo cierto es que el estricto carácter educacional, cultural y de servicio público de la misma quedó intacto.  Considera que los miembros no *ex officio* de la Junta de Directores de la Corporación no tienen vinculación alguna con la expresión del electorado cada cuatro (4) años en la caseta de votación, y "constituyen una mayoría para fines de las decisiones administrativas, y el curso de acción de la corporación".  Sostiene que una mayoría escoge al Presidente de la Corporación quien tiene a su cargo la administración general de la entidad y **será responsable ante la Junta de Directores de la política pública que se establezca**.

La referida parte alega que el requisito de justa causa para remover un miembro no *ex officio* de la Junta de Directores de la Corporación es inconstitucional.  Alega, además, que "la Gobernadora" tenía un **poder absoluto** sobre

los miembros de la Junta de Directores de la Corporación desde **dos ópticas distintas**. La **primera** se refiere al alegado "entendimiento" de los delegados de la Convención Constituyente sobre el proceso histórico previo a sus trabajos, que sostiene, le da contenido al principio constitucional del Poder Ejecutivo Unitario, de autoridad indivisa, con la superintendencia total, y pleno control sobre la política pública de su administración, aún la que se implanta a través de las instrumentalidades públicas del Gobierno de Puerto Rico organizadas como corporaciones públicas. [80] **Aduce que en esencia, este es un argumento "originalista" que tan sólo requiere no borrar, por las razones que sean, uno de los períodos más notables de la historia de Puerto Rico.** La **segunda óptica**, afirma, reconoce que **la naturaleza misma de la función que realiza la Corporación no permite fragmentarla o separarla del**

---

[80] Sostiene que las bases del informe de la Comisión de la Rama Ejecutiva de la Convención Constituyente evidenciaban el **"entendido constitucional"** de que la autoridad ejecutiva del Gobernador(a) incluía a las corporaciones públicas. Cita como apoyo de su argumento una parte de dicho informe que reza de la forma siguiente:

> *El Gobernador como director general de la administración pública.* La disposición consignada en el inciso (b) del artículo 4 de la proposición sustituta que **faculta al Gobernador para ejercer la dirección general de la administración pública** ha sido aprobada por vuestra Comisión con el claro entendimiento de que **comprende la supervisión e inspección** de los departamentos y agencias de gobiernos, **así como de las corporaciones públicas y de las entidades autónomas creadas por ley**. (Énfasis suplido).

**brazo del Primer Ejecutivo poniéndolas en manos de una Junta de Directores ocupada por miembros no *ex officio* que sólo pueden removerse por justa causa, y no a la entera discreción del Gobernador(a) de Puerto Rico.**

Sostiene esa parte que **dentro de la referida estructura unitaria de gobierno ejecutivo los miembros de la Junta de Directores de la Corporación son subordinados de confianza del Gobernador(a) de Puerto Rico. Alega que por la naturaleza de sus funciones tienen que ejercer sus cargos a la completa discreción del Gobernador(a) de Puerto Rico, sin limitación estatutaria como la que es objeto de cuestionamiento.** Arguye que la función de los miembros no *ex officio* de la Junta de Directores de la Corporación es una **"puramente ejecutiva"** porque sus facilidades se usan para fines educativos, culturales y de servicios al pueblo en general. Sostiene, además, que la Corporación no es un organismo cuasijudicial o cuasilegislativo que, por la naturaleza de sus funciones, pueda legislativamente desprenderse de la superintendencia plenaria del Primer Ejecutivo. Arguye que resolver este Tribunal que "la Gobernadora" no tenía el poder de remoción plenario para destituir a los miembros no *ex officio* de la Junta de Directores de la Corporación no sólo sería repudiar la historia y el contenido de la Constitución, sino que abriría una puerta ancha a la posibilidad de revivir los problemas del pasado que se trataron de evitar con la estructuración de un Poder Ejecutivo Unitario. **Expresa que**

**cualquier administración en el poder podría crear todo tipo de corporaciones públicas para dirigir programas fundamentales de gobierno mediante el nombramiento de funcionarios por términos fijos, no electos, con el fin de secuestrar o mutilar la formulación de política pública que le corresponde ejecutar al Gobernador(a) de Puerto Rico por mandato del Pueblo.**

El 20 de abril de 2004 el Procurador General compareció por escrito en calidad de *amicus curiae*.[81] El Procurador General arguye ante nos, como cuestión de umbral, que la imposición legislativa de justa causa, para destituir a un miembro no *ex officio* de la Junta de Directores de la Corporación viola el principio de separación de poderes que rige en nuestro sistema de derecho porque: (i) limita el control que el Gobernador(a) de Puerto Rico tiene sobre un funcionario Ejecutivo, nombrado por él(ella), que establece la política pública del Estado e implementa, sin independencia alguna, funciones constitucionalmente asignadas al Poder Ejecutivo; y, (ii) constituye una intromisión impermisible del Poder Legislativo en el campo de acción del Primer Ejecutivo. Entiende como procedente decretar la inconstitucionalidad del Artículo 3 de la Ley Núm. 216, *supra*, según enmendada.

El Procurador General examina y analiza la normativa prevaleciente en la jurisdicción federal, para fines

---

[81] El referido escrito fue titulado "Alegato del Estado Libre Asociado de Puerto Rico".

ilustrativos, por la similitud que guarda la Constitución de Estados Unidos con la nuestra sobre la referida temática. Sostiene, sobre la base de un análisis conjunto de las disposiciones relevantes de la Constitución de Estados Unidos, que el Presidente tiene la facultad de nombrar aquellos funcionarios quienes, entre otras funciones, tienen la obligación de asistirlo en su función primordial de **"poner en vigor las leyes"**. Arguye "...que el poder de nombramiento de la rama ejecutiva es esencial para que el Presidente, como funcionario ejecutivo principal, pueda mantener un control efectivo sobre el personal que ejerce funciones ejecutivas con el objetivo de ayudarlo a cumplir cabalmente con su función principal de hacer cumplir las leyes". Alega que la Rama Ejecutiva constituye una especie de **"cadena de mando"** donde el Primer Ejecutivo(a) es el funcionario principal encargado no sólo de **hacer cumplir las leyes sino también de velar porque los funcionarios nombrados por él ejecuten las leyes, en su representación de forma rigurosa**. Bajo ese esquema, el Primer Ejecutivo(a) le responde directamente a la ciudadanía por sus ejecutorias, y por aquellas efectuadas por sus subordinados. Por tal razón, afirma, esos funcionarios tienen que ser nombrados por él. Apoya su posición en la estrecha relación que alegadamente existe entre el **"poder de nombramiento del presidente"** y en su facultad de **"hacer cumplir las leyes"**.

El Procurador General fundamentó su posición en lo resuelto por el Tribunal Supremo de Estados Unidos en los casos de Myers, *supra*; Humphrey`s Executor, *supra*; Wiener, *supra*, y Morrison, *supra*. Sobre el alcance del caso de Morrison, *supra*, que como hemos podido ver es el más reciente, considera que aunque el análisis de la naturaleza de las facultades del funcionario en cuestión es un factor importante, es indispensable, además, que dicho análisis se realice a la luz del precedente que dispone que las limitaciones al poder de destitución no deben impedirle al Presidente cumplir con sus prerrogativas constitucionales, entre las cuales se encuentra el poder de **"poner en vigor las leyes"**. Sostiene que el Tribunal Supremo de Estados Unidos enfatizó en Morrison, *supra*, que existen dos (2) tipos de **"funcionarios ejecutivos"**, a saber, los **"funcionarios ejecutivos superiores"** y los **"funcionarios ejecutivos inferiores"**. En atención a esta diferencia ese Tribunal resolvió que el fiscal especial independiente es un **"funcionario ejecutivo inferior"** bajo la Cláusula de Nombramientos de la Constitución de Estados Unidos, con un término de incumbencia y jurisdicción limitada, sin facultad para establecer política pública, y por ende, no está bajo el control directo del Presidente en términos de la discreción concedida a este **"funcionario inferior"** por no ser considerada esencial para el funcionamiento de la Rama Ejecutiva. Arguye que en la jurisdicción federal cualquier determinación relacionada con la constitucionalidad de una

limitación estatutaria al poder de destitución del Primer Ejecutivo requiere un análisis caso a caso. Afirma que no se trata de determinar a cuál de las ramas de gobierno pertenece determinado funcionario. Sostiene que el análisis es uno de tipo funcional donde se debe evaluar la naturaleza de las facultades delegadas al funcionario en cuestión. Sostiene que los tribunales deben precisar, en primera instancia, si se trata de un **"funcionario ejecutivo principal"**, el cual responde directamente y es nombrado por el Primer Ejecutivo o un **"funcionario ejecutivo inferior"** el cual es nombrado y está subordinado a algún **funcionario ejecutivo principal**. Alega que cuando se trata de un funcionario con facultades **"puramente ejecutivas"** la facultad del Poder Legislativo para imponer un requisito de justa causa para destituir a dicho funcionario es mínima debido a que se trata, en la mayoría de los casos, de funcionarios que colaboran directamente con el Poder Ejecutivo en la implantación de la política pública y en la ejecución de aquellas funciones asignadas por la Constitución a esa rama de gobierno. Distingue el caso de aquellos funcionarios que, aunque ejercen funciones ejecutivas o administrativas, su función principal es ayudar al Poder Ejecutivo en la implantación de aquellos estatutos aprobados por la Rama Legislativa. Sostiene que generalmente, se trata de funcionarios con poder para tomar determinaciones que no pueden ser alteradas por el Poder Ejecutivo, como es el caso de aquellos con facultades de

naturaleza cuasilegislativa y cuasijudicial. Puntualiza que a estos últimos es necesario garantizarle un grado de independencia mayor que le permita cumplir con sus funciones libre de cualquier interferencia que frustren los propósitos para los cuales fue creado. Sostiene que la imposición del requisito de justa causa para la remoción de esos funcionarios constituyó un mecanismo útil para garantizar su independencia e imparcialidad; y, además, evita la posibilidad de que puedan ser destituidos de sus cargos por un simple capricho.

El Procurador General alega que bajo el principio de separación de poderes que está insito en nuestra Constitución, resultaría inconstitucional que una rama de gobierno, mediante sus actuaciones, debilite la autoridad de otra rama de gobierno. El Procurador General sostiene que en Puerto Rico sólo existen algunas decisiones que hacen referencia a precedentes federales relacionados con el poder de destitución del Primer Ejecutivo. Considera que el asunto ante nos es uno novel en nuestra jurisdicción, que debe ser resuelto a la luz de los principios de separación de poderes expresados. Puntualiza que considerado el principio de que **"[n]uestro gobierno actual se constituyó siguiendo el sistema ya establecido por los Estados Unidos, por lo que la separación de poderes en Puerto Rico proviene de la doctrina de separación de poderes de la Constitución**

**Norteamericana", [82] los precedentes federales resultan ilustrativos para que este Tribunal pueda certificar el asunto solicitado por la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico.**

El Procurador General arguye que históricamente se ha entendido que el Gobernador(a) de Puerto Rico posee la facultad de destituir a aquellos funcionarios que ha nombrado.  Sostiene que así fue reconocido y establecido expresamente en el Artículo 53 del Código Político de Puerto Rico que dispone lo siguiente:

### Destitución de funcionarios

El Gobernador tendrá facultad para separar a cualquier funcionario que hubiere nombrado, **con excepción de aquellos cuya destitución se disponga en alguna otra forma por la Constitución;** podrá declarar vacante el cargo y cubrirlo en la forma prescrita por la ley.[83]

Expresa que es precisamente con el transfondo histórico del Artículo 53 del Código Político, *supra,* que se aprobó la Constitución de Puerto Rico.  Puntualiza que la Convención Constituyente redactó el Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, con atención al hecho que el poder de destitución del Gobernador(a) de Puerto Rico, que alegadamente es distinto al poder de destitución del Presidente de Estados Unidos, tiene su

---

[82] Carmen M. Llull Vera, La separación de poderes en Puerto Rico: ¿Existe entre las ramas ejecutivas y legislativas?, 41 Rev. Der. P.R. 275 (2002).

[83] 3 L.P.R.A. sec. 6.

génesis en esa disposición estatutaria, vigente con anterioridad a la Constitución, y que el ejercicio de este poder está íntimamente interrelacionado con el poder de **"poner en vigor las leyes"**.

El Procurador General sostiene que la Corporación fue creada y organizada para operar aquellos medios de comunicación pertenecientes al Estado de tal forma que contribuya al desarrollo social, cultural y educativo de la ciudadanía. **Afirma que la Ley 216,** *supra,* **va dirigida a viabilizar que el Poder Ejecutivo ejercite su función de implantar la política pública en el área de la difusión pública. Expresa que a pesar de que fue creada con cierto grado de autonomía, la Corporación no perdió su cualidad de instrumentalidad gubernamental creada para responder a un propósito de utilidad pública, o sea para divulgar e impulsar aquellos programas educativos, deportivos, artísticos, musicales, culturales y de interés público con arreglo a las limitaciones establecidas con la Comisión Federal de Comunicaciones de Estados Unidos. Afirma que no estamos ante una entidad cuya ley habilitadora le concede un grado de independencia del Poder Ejecutivo para cumplir con sus funciones. Sostiene que por el contrario se trata de un cuerpo dirigido a articular la política pública formulada por el Poder Ejecutivo en lo que a difusión pública se refiere.** Puntualiza que por tal razón las funciones de la Junta de la Corporación son de naturaleza **"puramente ejecutivas",** las que son ejercidas con el

objetivo de articular la política pública establecida por el Primer Ejecutivo(a) en el área de la difusión pública; es decir, con el fin de ofrecer servicios de excelencia en el área de las comunicaciones y de información a la ciudadanía. **Añade, que la Corporación simplemente articula la política pública del Estado sin que le sea permitido formular una distinta por carecer de independencia para ello, y que los miembros de esa Junta son funcionarios nombrados por el Gobernador(a) de Puerto Rico con el propósito que colaboren con él(ella) en los propósitos de la Ley 216,** *supra,* **y la política pública en el área de las comunicaciones.**

La función de ser intérprete final de la Constitución de Puerto Rico le corresponde exclusivamente al Poder Judicial. La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente asignados a los tribunales.[84] Es función ineludible de los tribunales interpretar la Constitución y velar porque no se vulnere su espíritu y esquema democrático. Cuando haya conflicto sobre el alcance de los poderes constitucionales de una rama de gobierno, los tribunales deben intervenir, con prudencia y deferencia, para aclarar los contornos de

---

[84] Santa Aponte v. Srio. del Senado, 105 D.P.R. 750, 759 (1977); Band v. Floyd 385 U.S.110, 131 (1966).

la Constitución y facilitar la resolución de las diferencias.[85]

Nos reafirmamos en el postulado fundamental de hermenéutica constitucional que establece que al examinar la validez constitucional de un estatuto, el Poder Judicial, en consideración al principio de deferencia hacia el Poder Legislativo, debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley.[86] Es principio firmemente establecido en nuestro ordenamiento que **"un estatuto es y se presume constitucional hasta que resolvamos lo contrario"**.[87]

La Constitución de Puerto Rico delega todo el poder legislativo a la Asamblea Legislativa, sujeto a las limitaciones contenidas en su Carta de Derechos. La Asamblea Legislativa de Puerto Rico puede legislar sobre todo asunto que afecte el bienestar de los puertorriqueños

---

[85] Silva v. Hernández Agosto, *supra*, pág. 57; Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716, 731-734 (1982); Santa Aponte v. Srio. del Senado, *supra*; García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976); Fuster v. Busó, 102 D.P.R. 327 (1974).

[86] Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990); Banco Popular v. Mun. de Mayagüez, 126 D.P.R. 653 (1990); P.R.P. v. E.L.A., 115 D.P.R.631, 642 (1984); Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 618 (1981).

[87] Nogueras v. Hernández Colón, *supra*, pág. 412; Cerme-Vivas v. Srio. de Salud, 99 D.P.R. 45, 51 (1970); Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772, 783 (1968).

y que no esté expresa o implícitamente prohibido por el propio texto de la Constitución.[88]

El Gobernador(a) de Puerto Rico tiene la facultad y a la misma vez el deber y obligación, a tenor con el Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, de **cumplir y poner en vigor las leyes vigentes** y de **hacer cumplir y poner en vigor las mismas** a través de todos aquellos funcionarios que están bajo su poder de **"supervisión e inspección"**. Para el descargo de ese rol de naturaleza constitucional el Gobernador(a) de Puerto Rico tiene **poder absoluto e irrestricto** sobre ciertos y determinados **"funcionarios ejecutivos"** cuyas funciones son **"puramente ejecutivas"** y están directamente vinculadas con el descargo de su rol constitucional. De no tener facultades plenarias sobre esos funcionarios en el ejercicio de su **"poder de nombramiento y destitución"** no podría formular la política pública de la Rama Ejecutiva, a tenor con el mandato democrático del Pueblo. Tales funcionarios son esencial y fundamentalmente los miembros del Gabinete del Gobernador(a) de Puerto Rico y su cuerpo de asesores y ayudantes. A través de esos funcionarios se formula y se implanta la política pública de la Rama Ejecutiva, y se inicia, cuando es necesario, la aprobación, mediante proyectos de ley de administración, de estatutos ajustados al programa de gobierno del partido político en el poder. Una vez aprobada, y ya vigente esa legislación

---

[88] Noguera v. Hernández Agosto, *supra,* pág. 414.

los miembros del Gabinete fundamentalmente están llamados a **cumplirla y ponerla en vigor** en representación del Gobernador(a) de Puerto Rico. No obstante, de mantenerse vigentes ciertos y determinados estatutos por no ser derogados o enmendados por la nueva administración de gobierno en el poder, el Gobernador(a) de Puerto Rico tiene la facultad y a la misma vez el deber y obligación de cumplir con ellos y ponerlos en vigor, y de hacerlos cumplir y que se pongan en vigor a través de los funcionarios que están bajo su **"supervisión e inspección"**. Existen funcionarios que aunque están adscritos a la Rama Ejecutiva, y bajo el poder de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico las funciones que ejercitan no son esenciales y fundamentales para que éste(a) último(a) pueda rendir su rol constitucional. Sobre esos funcionarios el **"poder de destitución"** del Gobernador(a) no es absoluto y puede ser restringido y limitado por la Asamblea Legislativa de Puerto Rico, sin menoscabar el poder de **"supervisión e inspección"** de naturaleza constitucional que el Primer Ejecutivo(a) tiene sobre ellos. Existen algunas situaciones donde el Poder Legislativo puede utilizar tal mecanismo para concederle a ciertos y determinados funcionarios adscritos a la Rama Ejecutiva con la independencia y autonomía que es necesaria para que puedan descargar ciertas funciones sin interferencia y por ende, en esos casos, de una forma más efectiva y eficiente. Ese es el caso de algunos

funcionarios que aunque están adscritos a la Rama Ejecutiva y bajo el poder de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico descargan funciones cuasijudiciales o cuasilegislativas, a los que hacen referencia los casos de Humphrey´s Executor, *supra*, y de Wiener, *supra.* No obstante, tal situación no está limitada sólo a ese tipo *de funcionarios, como dispone el caso de* Morrison*, supra.* Existen funcionarios que aunque sus funciones son ejecutivas no son esenciales ni fundamentales para que el Gobernador(a) de Puerto Rico descargue y desempeñe su rol constitucional. A estos funcionarios la Asamblea Legislativa les puede conceder independencia de la Rama Ejecutiva y autonomía para el descargo y desempeño de sus funciones, siempre y cuando se preserve la facultad de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico sobre ellos.

El 16 de junio de 1993 se creó la Junta de Síndicos de la Universidad de Puerto Rico por virtud de la Ley Núm. 17.[89] Dicho cuerpo habría de gobernar la Universidad de Puerto Rico, provisto y sujeto a la autonomía universitaria y a los objetivos dispuestos en los Artículos 2[90] y 4[91] de la Ley Núm. 1, de 20 de enero de 1966 conocida como Ley de la Universidad de Puerto Rico, según enmendada, que disponen lo siguiente:

---

[89] 18 L.P.R.A. sec. 602.

[90] 18 L.P.R.A. sec. 601.

[91] 18 L.P.R.A. sec. 603.

**Sección 601 Objetivos**

a) La Universidad, **como órgano de la educación superior, por su obligación de servicio al pueblo de Puerto Rico y por su debida fidelidad a los ideales de una sociedad integralmente democrática,** tiene como **misión esencial** alcanzar los siguientes objetivos, con los cuales es consustancial la más amplia libertad de cátedra y de investigación científica:

(1) **Transmitir e incrementar** el saber por medio de las ciencias y de las artes, **poniéndolo al servicio de la comunidad a través de la acción de sus profesores, investigadores, estudiantes y egresados.**

(2) Contribuir al cultivo y disfrute de los valores éticos y estéticos de la cultura.

(b) En el cumplimiento leal de su misión, la Universidad deberá:

(1) **Cultivar el amor al conocimiento como vía de libertad** a través de la búsqueda y discusión de la verdad, **en actitud de respeto al diálogo creador.**

(2) Conservar, enriquecer y difundir los valores culturales del pueblo puertorriqueño y fortalecer la conciencia de su unidad **en la común empresa de resolver democráticamente sus problemas.**

(3) Procurar la formación plena del estudiante, en vista a su responsabilidad como servidor de la comunidad.

(4) Desarrollar a plenitud la riqueza intelectual y espiritual latente en nuestro pueblo, a fin de que los valores de la inteligencia y del espíritu de las personalidades excepcionales que surgen de todos sus sectores sociales, especialmente los menos favorecidos en recursos económicos, puedan ponerse al servicio de la sociedad puertorriqueña.

(5) **Colaborar con otros organismos, dentro de las esferas de acción que le son propias, en el estudio de los problemas de Puerto Rico.**

(6) **Tener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática.**

## Sección 603 Vigencia

**La Universidad de Puerto Rico constituirá un sistema orgánico de educación superior,** compuesto por las siguientes unidades institucionales, y las que en el futuro se crearen, **las cuales funcionarán con autonomía académica y administrativa dentro de las normas que dispone esta sección y las que se fijen en el reglamento de la Universidad o resoluciones de la Junta de Síndicos,** creada mediante las secs. 852 et seq. de este título... (Énfasis suplido).

**La Junta de Síndicos de la U.P.R. habría de estar compuesta de trece (13) miembros nombrados por el Gobernador(a) de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico, en una forma escalonada y sólo podrán ser destituidos por justa causa y previa formulación de cargos.**

El 16 de junio de 1993 se creó el Consejo de Educación Superior por virtud de la Ley Núm. 16.[92] Dicho estatuto dispuso sobre su **autonomía institucional para evitar "interferencias oficiales que menoscaben su libertad académica o atenten contra ésta." El mismo habría de estar**

---

[92] 18 L.P.R.A sec. 852 (2).

**compuesto por nueve (9) miembros, el Secretario(a) de Educación, que será miembro *ex officio*, y ocho (8) miembros adicionales nombrados por el Gobernador(a) con el consejo y consentimiento del Senado de Puerto Rico, quienes representarán lo más adecuadamente el interés público y la política pública establecida por ese estatuto en cuanto a la educación superior. Esos ocho(8) miembros sólo pueden ser destituidos de sus cargos por justa causa, previa formulación de cargos.[93]**

El 21 de junio de 1955 se creó, por virtud de la Ley Núm. 89, el **Instituto de Cultura Puertorriqueña como una entidad oficial, corporativa y autónoma,** cuyo propósito es conservar, promover, enriquecer y divulgar los valores culturales puertorriqueños y lograr el más amplio y profundo conocimiento y aprecio a los mismos.[94] Se dispuso **el nombramiento de su Junta de Directores en una forma escalonada.[95] Esta es una entidad con personalidad jurídica independiente y separada, como instrumentalidad pública, del resto del gobierno.[96]**

En C.E.S. U.P.R. v. Gobernador[97] el Consejo de Educación Superior de la Universidad de Puerto Rico, creado

---

[93] 18 L.P.R.A. sec. 852(c).

[94] 18 L.P.R.A. sec. 1195.

[95] 18 L.P.R.A. sec. 1196.

[96] Op. Sec. Just. Núm. 1956-28.

[97] 137 D.P.R. 83 (1994).

por la Ley Núm. 1 de 20 de enero de 1966,[98] y algunos de sus miembros nos solicitaron la revisión de una sentencia del entonces Tribunal Superior que declaró sin lugar una demanda que impugnó la constitucionalidad de la Ley Núm. 12 de 7 de junio de 1993[99] y de las Leyes Núms. 16 y 17 de 16 de junio de 1993, *supra*, respectivamente.  Estos estatutos eliminaron el Consejo de Educación Superior de la Universidad de Puerto Rico  y crearon otros dos (2): un nuevo Consejo de Educación Superior, con la única función de acreditar a instituciones privadas de educación superior, y otro, la Junta de Síndicos para gobernar la Universidad de Puerto Rico, función que, junto a la de acreditación, le correspondía antes al Consejo de Educación Superior de la Universidad de Puerto Rico.

Al aprobarse la referida legislación los miembros del Consejo de Educación Superior instaron una demanda contra el entonces Gobernador de Puerto Rico.  Alegaron que esas leyes eran inconstitucionales por ser violatorias de la libertad académica y a la autonomía de la Universidad de Puerto Rico, las cuales alegadamente fluyen del derecho constitucional a la libre expresión y les privó, alegadamente, de su libertad y propiedad sin el debido proceso de ley.  Este Tribunal sostuvo la presunción de constitucionalidad de los estatutos impugnados.  Por no haberse colegiado una Opinión del Tribunal se dictó una Sentencia.  El entonces Juez Asociado señor Negrón García

---

[98] 18 L.P.R.A. sec. 601 et seq.

[99] 18 L.P.R.A. sec. 261 c.

emitió una opinión concurrente. El Juez Asociado señor Rebollo López emitió una opinión concurrente. El entonces Juez Asociado señor Hernández Denton emitió una opinión concurrente, a la cual se unieron el entonces Juez Presidente señor Andréu García y la entonces Jueza Asociada señora Naveira Merly. El entonces Juez Asociado señor Alonso Alonso emitió una opinión disidente, a la cual se unió el Juez Asociado señor Fuster Berlingeri, quien a su vez emitió un voto particular.

Aunque no fue pautada norma jurisprudencial alguna en el caso de C.E.S. U.P.R. v. Gobernador, *supra*, ciertamente las opiniones concurrentes y disidentes de los miembros de este Tribunal contienen expresiones que nos resultan ilustrativas y persuasivas para la atención y disposición del asunto ante nos. Veamos.

En su Opinión concurrente el entonces Juez Asociado señor Negrón García expresó lo siguiente:

> La sentencia mayoritaria recoge hoy, de forma escueta, la esencia de nuestro voto disidente de 24 de septiembre de 1993 y llega al mismo resultado. Revisitémosla. Merece recordarse que
>
> ... la composición de la nueva Junta de Síndicos de la U.P.R. tampoco presenta, de su faz, defectos constitucionales o infracción a la libertad de cátedra. **Se argumenta el hecho de que los nombramientos del Consejo se hacen de forma escalonada para impedir que éste se encuentre a merced de los cambios de gobierno. Es un dato histórico, de fácil comprobación, que la Ley Núm. 135 de 1942 (18 L.P.R.A. secs. 631-636 y 638-658) la cual creó el Consejo Superior de Enseñanza, y la Ley Núm. 1,**

*supra*, la cual derogó a aquél y estableció el *Consejo*, aumentaron su composición, lo cual unido a las vacantes existentes *siempre* han permitido que los gobernadores incumbentes pudieran nombrar personas de su *predilección*. Obviamente, el elemento político partidista estuvo presente en ese proceso de selección y viabilizó un control institucional. Ante esta realidad, más allá del papel legal, ¿cómo pueden entonces los peticionarios Awilda Aponte Roque *et al.*, argumentar que la fórmula de escalonamiento en los términos de la Ley Núm. 1, *supra*, "dio plena vigencia a los postulados de autonomía y libertad académica"?

Naturalmente, los puestos creados por la nueva ley son inicialmente ocupados por las personas que nombre el Gobernador.[100] Ello no la invalida, pues es *incidental* a su aprobación. *No crea una situación distinta a las leyes antecesoras del Consejo*, ni se aparta a lo que de ordinario ocurre al crearse o ampliarse nuevas juntas o departamentos ejecutivos. Además, luego de estos primeros nombramientos, la ley reproduce la fórmula de que los subsiguientes se harán en forma escalonada. *Si antes fue bueno y constitucional, ¿por qué ahora no lo es?*

Este enfoque no es ad hoc. No puede divorciarse el clima universitario –libertad de asociación y expresión, esto es, los derechos civiles de los educadores, profesores y estudiantes– de los poderes de la Asamblea Legislativa. "Este es un asunto *que corresponde atender a la Asamblea Legislativa*, en cumplimiento de los *mandatos constitucionales,* para marcar los límites de la reglamentación intrauniversitaria. *No se trata de una cuestión que corresponda exclusivamente a la autonomía de la Universidad."* (Énfasis suplido). Informe Especial

---

[100] Excepto el representante estudiantil y los dos (2) profesores.

> **Sobre la Libertad Académica en la U.P.R., Comisión de Derechos Civiles, *Lino J. Saldaña*, Presidente, 15 de marzo de 1967, pág. 22.**

> Finalmente, **se alega que la promulgación es estas medidas ha tenido el efecto de destituir ilegalmente a los miembros del Consejo. El argumento adolece del mismo defecto. ¿En qué consiste la destitución aludida? Ellos continúan siendo miembros del Consejo, no se han alterado las dietas que perciben ni el término por el cual fueron nombrados; sólo se han modificado algunas de sus funciones.** Antes estaban a cargo de la acreditación y corrección de las licencias a Instituciones Privadas de Educación Superior y administrar la U.P.R. Las nuevas leyes le asignan sólo la primera de estas dos(2) funciones.

> . . .

> ***En ausencia de reclamo específico de un menoscabo real a los derechos constitucionales sustanciales*, hemos de superar la tentación de atender y entender cuestiones hipotéticas, abstractas o contingentes.** [101] (Énfasis suplido).

En su opinión concurrente el Juez Asociado señor Rebollo López expresó, lo siguiente:

> Hace aproximadamente un (1) año —específicamente, el 24 de septiembre de 1993— al disentir de la acción de una mayoría de los integrantes del Tribunal de "acoger" el recurso de apelación que ante este Foro radicara la parte demandante apelante, expresamos, entre otras cosas, que el recurso de apelación radicado era *claramente inmeritorio* al cual *no* se le

---

[101] <u>C.E.S. U.P.R. v. Gobernador</u>, *supra*, págs. 86, 88-89, 90 (1994).

debía dar curso y que la acción mayoritaria, de así hacerlo,

> ... pone en grave riesgo, durante el tiempo que le tome a este Tribunal resolver el recurso, el buen funcionamiento, y estabilidad, de la única institución pública universitaria de nuestro País; ello con el consabido perjuicio a nuestra juventud. (Énfasis suprimido.) *C.E.S. v. Gobernador I*, 134 D.P.R. 350, 364 (1993), voto disidente.

> ***...los derechos constitucionales de los referidos funcionarios no son afectados en forma alguna por la legislación en controversia**. Dicha legislación lo que, *meramente*, hace es *transferir* una (1) de las dos (2) funciones que hasta ahora había venido desempeñando el C.E.S. a la nueva Junta de Síndicos de la Universidad; acción por la que habían venido *clamando* muchos educadores en Puerto Rico. El hecho de que los miembros del C.E.S. *prefieran* desempeñar la función que fuera transferida a la nueva Junta *no* hace que la legislación sea inconstitucional. *Ello es una determinación de política pública, la que tiene derecho a hacer la Asamblea Legislativa de Puerto Rico, que está fuera del ámbito de la revisión judicial*. Nuevamente, la jurisprudencia que citan los apelantes en apoyo de su posición, es *claramente* distinguible e inaplicable.

> *...un examen objetivo y desapasionado de las leyes en controversia revela que las mismas, de su faz, no afectan en forma alguna ni la libertad de cátedra, ni el derecho a la libre expresión, ni ningún otro derecho constitucional, que nuestra Constitución le pueda garantizar a*

> *los miembros de la comunidad universitaria...* [102] (Énfasis suplido).

En su opinión concurrente el entonces Juez Asociado señor Hernández Denton, a la que se unieron el entonces Juez Presidente señor Andréu García y la entonces Jueza Asociada señora Naveira Merly, expresó lo siguiente:

> Al evaluar la controversia del caso de marras, **partimos de la premisa de que la Universidad de Puerto Rico tiene funciones únicas en nuestra vida democrática: conservar y transmitir nuestra herencia cultural y académica; esclarecer y analizar la realidad del país; propiciar el diálogo creativo, y transmitir y respetar los valores básicos de la civilización, particularmente los derechos humanos. También partimos de la premisa de que la misión de la Universidad –en nuestra sociedad– requiere que el claustro disfrute de una libertad académica amplia para pensar, enseñar, investigar y expresarse libremente.**
>
> . . .
>
> Los miembros del Consejo sostienen que la legislación aprobada por el Gobernador infringe la cláusula constitucional de debido proceso tanto en su modalidad substantiva como procesal.
>
> En **su vertiente procesal, la cláusula de debido proceso le impone al Estado la obligación de garantizar que la interferencia, con los intereses de libertad y de propiedad del individuo, se haga a través de un procedimiento que en esencia sea justo y equitativo. La validez de la ley, en términos substantivos, no es pertinente a los fines de evaluar si cumple con el debido proceso de ley procesal.**

---

[102] Íd., págs. 91,93.

*Rodríguez   Rodríguez   v.   E.L.A.*,   130
D.P.R.  562  (1992).

**Para   determinar   si   una   persona
posee  un  interés  propietario  dentro  del
contexto  de  un  ataque  bajo  la  cláusula
de   debido   proceso   en   su   vertiente
procesal,  es  necesario  que  se  tenga  algo
más  que  una  mera  expectativa  unilateral
de  titularidad;  se  debe  tener  un  derecho
concreto  protegido  por  el  ordenamiento
jurídico  estatal.** *Board  of  Regents  v.
Roth*,   408   U.S.   564   (1972);   *Orta   v.
Padilla  Ayala*,  131  D.P.R.  227  (1992).
**En  Puerto  Rico,  un  empleado  público
tiene   un   reconocido   interés   en   la
retención  de  su  empleo  si  dicho  interés
está  protegido  por  la  ley  (empleado  de
carrera)   o   cuando   las   circunstancias
crean   una   expectativa   de   continuidad.**
*Díaz  Martínez  v.  Policía  de  P.R.*,  134
D.P.R.   144   (1993);   *Orta   v.   Padilla
Ayala*,  supra;  *Torres  Solano  v.  P.R.T.C.*,
127  D.P.R.  499  (1990).

**Los  miembros  del  Consejo  alegan  que
tienen  un  interés  propietario  sobre  la
función  de  gobernar  la  Universidad  de
Puerto  Rico.  Implícitamente  reconocen
que  no  se  les  privó  del  interés
propietario  que  pudiesen  tener  sobre  sus
puestos.** Sin  embargo,  como  hemos
señalado, **nuestro  ordenamiento  sólo  le
reconoce  al  empleado  público  de  carrera
un  interés  propietario  sobre  el  cargo  o
empleo  que  desempeñe,  pero  no  sobre  las
funciones  que  realiza.**[103]

Un   análisis   integral   de   la
legislación  revela  que,  en  términos
prácticos,  los  estatutos  impugnados
sólo  afectaron  las  funciones  que  los
miembros  del  Consejo  ejercían,  para
permitirles   continuar,   si   así   lo

---

[103] Por  el  contrario  nuestra  Constitución  concede  la  facultad
expresa  a  la  Asamblea  Legislativa  para  "crear,  consolidar  o
reorganizar   departamentos   ejecutivos   y   definir   sus
funciones".  Art.  III,  Sec  16,  Const.  E.L.A.,  L.P.R.A.,  Tomo
1,  ed.  1982,  pág.  343.  Esta  disposición  fortalece  nuestra
conclusión  de  que,  ausente  alguna  disposición  en  contrario,
los  empleados  públicos  no  tienen  interés  propietario  alguno
sobre  las  funciones  que  desempeñen.

deseaban, con la facultad de acreditación de instituciones privadas, de ese modo conservarían sus puestos hasta la expiración del termino original para el cual fueron nombrados. [104] Por tal razón, **no es pertinente el hecho de que los miembros del Consejo, bajo la legislación anterior, ocupaban sus cargos por un término fijo; bajo la legislación vigente, éstos pudieron continuar en sus puestos hasta que finalizara dicho término. En estas circunstancias, concluimos que la legislación impugnada no priva a los miembros del Consejo de interés propietario alguno. Éstos no pueden fundar su reclamo en la vertiente procesal de la cláusula de debido proceso.**

. . .

**La autonomía universitaria es el principio que consiste en aislar, en mayor o menor grado, a una universidad pública del control, la reglamentación y la intervención gubernamental.** Está reconocido en varias jurisdicciones que un máximo de autonomía es beneficioso para una universidad pública, pues reduce a un mínimo las influencias políticas sobre la tarea universitaria. [105] Por tal razón, **varios estados le han otorgado un rango constitucional a la autonomía universitaria para que la institución no esté sujeta a las ideas cambiantes**

---

[104] Tampoco existe acuerdo o contrato alguno que sustente el reclamo de interés propietario de los miembros del Consejo.

[105] Durante su historia, la Universidad de Puerto Rico ha sido víctima de intervenciones políticas y, como regla general, su estudiantado ha clamado por mayor autonomía para dicha institución. ...[L]a autoridad conferida a la Junta de Síndicos por la ley de 1925 la mantenía [a la Universidad] sometida a los vaivenes de la política partidista local y privada de la independencia académica consubstancial al buen funcionamiento de una institución de educación superior." Isabel Picó de Hernández, *Los estudiantes universitarios y el proceso político puertorriqueño (1903-1948),* Tesis, Departamento de Gobierno de la Universidad de Harvard, 1974, pág. 194. Véase, además, íd., págs. 117, 196-208 y 227-239.

**y, a veces, caprichosas sobre la educación y los métodos administrativos que le parecen sabias a los organismos políticos.**[106] H.W. Horowitz, The Autonomy of the University of California under the State Constitution, 25 U.C.L.A. L. Rev. 23, 25 (1977). **Sin embargo, como son fondos públicos los que sostienen la universidad pública, esta autonomía rara vez es total.** Véase, en general, J.P. Byrne, Academic Freedom: A "Special Concern of the First Amendment", 99 Yale L.J. 251, 327331 (1989).

. . .

**La autonomía fiscal no es la única manera en que nuestra legislación refleja la autonomía otorgada a la Universidad de Puerto Rico. Se dispone también que la Universidad será una corporación pública dirigida por un cuerpo colegiado cuyos miembros son nombrados por un término fijo. Por ende, el poder del Gobernador para remover estos funcionarios está limitado a situaciones en las cuales exista justa causa. Aunque bajo la Ley Universitaria los miembros del Consejo eran nombrados por el Gobernador con el consejo y consentimiento del Senado, mediante el sistema de nombramientos escalonados los cambios en la composición del Consejo ocurrían**

---

[106] **Las Constituciones de los siguientes estados otorgan expresamente un rango constitucional a la autonomía de sus universidades públicas:** California, Georgia, Hawaii, Idaho, Michigan, Minnesota, Montana, Nebraska y Oklahoma. J.P.Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 327 esc. 303 (1989). Véase, también, H.W. Horowitz, *The Autonomy of the University of California under the State Constitution*, 25 U.C.L.A. L. Rev. 23, 25 (1977); *Regents of University of Minnesota v. Lord*, 257 N.W.2d 796, 800 (1977). En Minnesota, donde la Universidad pública tiene un rango constitucional, la jurisprudencia ha resuelto que el propósito de dicha disposición constitucional fue el poner " `the management of the greatest state educational institution beyond the dangers of vacillating policy, ill informed or careless meddling and partisan ambition that would be possible in the case of management by either legislature or executive´". *Regents of the University of Minnesota v. Lord*, supra, pág. 800.

> **gradualmente y se aislaba parcialmente a la Universidad de los cambios en las ramas políticas. De este modo, se evitaba que una sola administración gubernamental sustituyera súbitamente a toda la junta de gobierno universitaria y se garantizaba cierto grado de independencia y continuidad en el proceso decisional.**

> **...es evidente que el principio de autonomía, mediante el cambio gradual en la composición de la junta de gobierno universitaria, quedaría eliminado si cada cuatro (4) años una nueva administración desplazara totalmente a los integrantes de dicha junta de gobierno para constituir otra nueva con personas de su predilección ideológica.**[107]

En su opinión disidente el entonces Juez Asociado señor Alonso Alonso, a la que se unió el Juez Asociado señor Fuster Berlingeri, expresó lo siguiente:

> Y es que **el compromiso primario de la Universidad radica en la sociedad intelectual. Son la duda creativa y la búsqueda de la verdad, el respeto a la disidencia, la investigación, la transmisión de la información y la calidad académica lo que establece la distinción con otras instituciones sociales igual de buenas, pero ciertamente distintas de la Universidad.**

> **Si algo importante debe tener un sistema democrático como el nuestro es que las instituciones existan en forma estable, por encima de los intereses inmediatos que puedan tener las personas particulares.**

> **...no es democrático sino despótico, y acaso hasta tiránico, cuando el Gobierno invoca a la mayoría que lo sustenta e invade territorios que no son suyos, como ocurre por desgracia**

---

[107] C.E.S. U.P.R. v. Gobernador, *supra*, págs. 96, 109-111, 116-117, 118-119.

**cuando una comunidad se deja llevar por el carisma de un líder o por una ideología sin suficientes raíces en la conciencia de los gobernados. No sólo las personas individuales tienen destinos, sino también lo tienen las instituciones en cuanto llevan inscrito en ellas la posibilidad de ser más y mejores de lo que son en el presente.** (Citas omitidas).

Este destino de la Universidad está estrechamente ligado al contenido del Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico en cuanto a **"continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de [los] derechos".** *Preámbulo*, *supra*, pág. 251. **En fin, existe un vínculo firme y fuerte entre la vivencia universitaria y el ejercicio de la democracia.** *El destino de la Universidad es darle contenido empírico al Preámbulo de la Constitución, de lo cual se enriquece y fortalece la democracia.*

En cuanto a **esta indelegable misión de la Universidad como conciencia democrática de la sociedad civil y máximo laboratorio para la experimentación democrática, "reino de la inconformidad y la disidencia"** --como bien la catalogara la ilustre puertorriqueña Nilita Vientós Gastón-- **basta recordar cómo históricamente las universidades han sido los principales enemigos contra los cuales se han ensañado los regímenes totalitarios en todo el planeta.** J.R. Fernández, Universidad y Poder, Diálogo, 14 de abril de 1992. **En democracias liberales como la nuestra, el Gobierno de la mayoría debe respetar y proteger a la Universidad como una de las instituciones deliberativas "que contribuye a dar contenido y forma al proyecto de sociedad"...**

**En la medida que se interviene de forma indebida con esta función, el diálogo, la discusión y la deliberación se quebrantan,** *violentándose así la libertad de expresión* **garantizada por**

nuestra Constitución y la Constitución federal.

. . .

...al nombrarse los miembros del C.E.S. por el Gobernador con el consejo y consentimiento del Senado, *mediante un sistema de nombramientos escalonados*, las vacantes ocurrirían gradualmente, con lo cual *se ha pretendido aislar parcialmente* a la Universidad de los cambios e intervenciones de las ramas políticas de gobierno.

Las dos (2) medidas antes mencionadas han permitido cierto grado de independencia y continuidad en la U.P.R. y en el C.E.S. La propia Ley de la Universidad de Puerto Rico limitó el poder del Gobernador *para remover* a los miembros del C.E.S. a situaciones *en las cuales medie justa causa...*

. . .

**El reconocimiento de la autonomía universitaria** y de la libertad académica institucional *como parte del derecho a la libertad de expresión* nos permite salvaguardar adecuadamente a la Universidad contra una intervención impermisible del Estado.

...*La amplitud del derecho a la libertad académica bajo nuestra Constitución incorpora elementos esenciales de la autonomía universitaria*. **Su reconocimiento forma parte de la aspiración colectiva de nuestro pueblo, plasmada en el Preámbulo de la Constitución, a enriquecer contínuamente nuestro acervo democrático en el disfrute individual y colectivo de nuestras libertades.** Corresponde, pues, a los tribunales interpretar y vindicar este derecho.

*Es indispensable en una democracia que las universidades mantengan un clima de libre pensamiento y expresión en sus actividades académicas y*

*extracurriculares, pues de lo contrario se imposibilitan las funciones universitarias de educar las nuevas generaciones según las mejores tradiciones democráticas; procurar la verdad y el avance del conocimiento mediante la libre confrontación de teorías e ideales; y dar orientación y ejemplo a la comunidad, no sólo en los aspectos substantivos de las ciencias y las artes, sino también en los estilos de tolerancia, respeto e iniciativas de libre discusión.* (Énfasis suplido.) Comisión de Derechos Civiles, Informe especial sobre la libertad académica en la Universidad de Puerto Rico, San Juan, Departamento de Hacienda, 15 de marzo de 1967, pág. 13.

. . .

**Tomando en consideración los factores antes citados,** *sostenemos que la administración académica, como componente esencial de la libertad académica institucional y de la libertad de expresión individual, no puede ser utilizada para intervenir indebidamente en la Universidad, pues ello no sólo afectaría la docencia y la libertad académica individual, sino que tendría un efecto congelante ("chilling effect") sobre ésta y sobre la libertad de expresión individual y de la comunidad universitaria, pues quebranta el diálogo creador, la discreción enriquecedora y la deliberación libre de los individuos y de los componentes de la comunidad universitaria.*

En *Sánchez Carambot v. Dir. Col. Univ. Humacao*, 113 D.P.R. 153, 161 (1982), citando a *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979), **señalamos que se trata "de proteger [la] discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia".** (Escolio omitido.) Lo indicado antes fue expresamente reconocido por la Asamblea Legislativa al disponer que la U.P.R., en el

cumplimiento de su misión, debería "'[t]ener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, *ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática'* ... 18 L.P.R.A. sec. 601 inciso b(6)". (Escolio omitido y énfasis suplido.) *Sánchez Carambot v. Dir. Col. Univ. Humacao*, supra, pág. 161.

. . .

**Si el Estado entendía que algunos miembros del C.E.S. o funcionarios de la U.P.R. habían incurrido en conducta impropia en el ejercicio de su cargo, el mecanismo apropiado para resolver este asunto era mediante la formulación de unos cargos y probar justa causa para su despido individual, para así cumplir con el debido proceso de ley...** (Énfasis suplido).[108]

En su voto particular el Juez Asociado señor Fuster Berlingeri expresó lo siguiente:

...es innegable que, en nuestro ordenamiento jurídico, **el Gobierno está constitucionalmente impedido para actuar conforme a fines político-partidistas cuando tal acción estatal afecte indefectible y adversamente los derechos fundamentales de otras personas. En Puerto Rico la libertad de expresión no puede ser restringida o menoscabada por el Estado, salvo que exista un interés público apremiante.** *Sánchez Carambot v. Dir. Col. Univ. Humacao,* 113 D.P.R. 153 (1982); *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979); *Mari Bras v. Casañas,* 96 D.P.R. 15 (1968). **No es necesario acudir a teorías jurídicas enjundiosas ni a profundos análisis de derecho para reconocer que las conveniencias partidistas de los gobernantes de turno no constituyen un**

---

[108] Íd., págs. 141, 142-143, 155-156, 157, 160, 177.

**interés público apremiante que justifique coartar los derechos de expresión...**

. . .

Es menester enfatizar que, desde hace ya mucho tiempo, **se ha reconocido que en el ámbito universitario los profesores y estudiantes disfrutan de un derecho fundamental a la libre expresión, que incluye la facultad de disputar con libertad las ideas y creencias tradicionales y de explorar sin cortapisas tanto los cimientos como las fronteras del conocimiento. Esa libertad de cuestionarlo todo, en aras de buscar la verdad, no puede ser conculcada de *modo alguno* por el Estado. A los poderes gubernamentales les está vedado, incluso, menoscabar el clima o ambiente de seguridad, abertura, franqueza y hasta de osadía erudita que debe prevalecer en una universidad para que esa libertad de cuestionarlo todo pueda ejercerse propiamente y florecer.**

Uno de los grandes constitucionalistas americanos, el Juez Frankfurter del Tribunal Supremo de Estados Unidos, se expresó sobre el particular con las citas y los comentarios siguientes:

> *Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society... For society's good --if understanding be an essential need of society-- inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom....*
>
> ... This means the exclusion of

governmental intervention in the intellectual life of a university. *It matters little whether such intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars,* qualities at once so fragile and so indispensable for fruitful academic labor ....

**... A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest. A university is characterized by the spirit of free inquiry... This implies the right to examine, question, modify and reject traditional ideas and beliefs ....**

**... Freedom to reason and freedom for disputation... are the necessary conditions for the advancement of scientific knowledge.** *A sense of freedom is also necessary...* *It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation."* (Énfasis suplido.)[109]

. . .

**Las acciones gubernamentales inconstitucionales son insidiosas, por mínimas que parezcan. Si no se atajan a tiempo, dan pie a acciones ilícitas futuras cada vez más palpables y conspicuas...** (Énfasis suplido).[110]

La Ley Núm. 216, *supra*, creó la Corporación de Puerto Rico para la Difusión Pública como instrumentalidad pública con personalidad jurídica independiente y separada de cualquier otra entidad, agencia o departamento del Gobierno de Puerto Rico. **Le adscribió autonomía funcional y**

---

[109] Sweezy v. New Hampshire, 354 U.S. 234, 261-263 (1957).

[110] C.E.S. U.P.R. v. Gobernador, *supra*, págs. 182-183, 184-185, 185-186.

**operacional para desarrollar un foro público para la libre expresión de la ciudadanía sobre las áreas de educación y cultura y para la divulgación de la política pública del Gobierno sobre esos temas.** Dispuso que los programas difundidos por la Corporación deben guiarse por una política de **"objetividad y balance"** en todo lo que fuere de naturaleza controversial sobre esos temas. **Prescribió la independencia de esa entidad y la referida autonomía de sus funciones para el logro del propósito de crear un foro público que la ciudadanía pueda utilizar para expresarse en forma individual, o a través de organizaciones sobre los referidos temas, e influenciar la opinión pública sobre los mismos.** Le garantiza la libertad a la ciudadanía para expresarse a través de los medios de comunicación de la Corporación sobre la política pública formulada por el Gobierno de Puerto Rico. Evita el control absoluto del Poder Ejecutivo de esos medios de comunicación para permitir la consecución de tal propósito. Permite y facilita al Departamento de Educación, **al Instituto de Cultura Puertorriqueña y a la Universidad de Puerto Rico**, concediéndole trato preferencial y especial a sus necesidades y requerimientos, difundir la formulación de política pública sobre sus respectivas áreas. Regula la utilización por la Rama Ejecutiva de esos medios de comunicación de difusión pública del Estado, y permite el libre flujo de ideas sobre esos temas y la formulación de opinión pública sobre los mismos, contribuyendo **"al**

desarrollo de una conciencia crítica" y a "ejemplarizar el respeto a la dignidad y a los derechos humanos". No obstante, dicho estatuto preserva el poder del Gobernador(a) de Puerto Rico de "supervisión e inspección" de los miembros no *ex officio* de la Junta de Directores de la Corporación, como parte de su facultad y a la misma vez de su deber y obligación de hacer cumplir esa ley y de que se ponga en vigor la misma, al permitirle destituirlos por justa causa al no cumplir con su propósito y mandato. A tenor con ese poder de "supervisión e inspección" del Gobernador(a) de Puerto Rico sobre la Corporación y su Junta el Artículo 7 del referido estatuto dispuso que ese ente corporativo presentará anualmente al Primer Ejecutivo(a) a una relación de los desembolsos totales que espera realizar en sus actividades y funcionamiento.

La formulación de política pública, dentro de las limitaciones que le impone la Constitución de Puerto Rico, **sobre el área de la educación pública y privada en todos sus niveles,** las ciencias, el deporte, el campo artístico y el musical, entre otros muchos de interés público es una **esencial y fundamental para el descargo y desempeño del rol constitucional del Gobernador(a) de Puerto Rico.** No obstante, la difusión pública de la política pública formulada en esas áreas **a través de medios de comunicación propiedad de una instrumentalidad del Estado no lo es.**

Hemos reconocido que la expresión del Gobierno de naturaleza informativa sobre las diferentes áreas de

formulación de política pública es indispensable para que el pueblo pueda juzgar su labor y exigir remedio a los agravios gubernamentales. [111]    Nuestra jurisprudencia refleja la tendencia seguida a favor de la divulgación de información pública, al punto de impartirle una dimensión amplia y robusta a la libertad de expresión  consagrada en nuestra Carta de Derechos.[112]

Hemos expresado en forma reiterada que existe una estrecha relación entre el derecho a libre expresión y a la libertad de información.  Sin conocimiento de hechos no se puede juzgar ni se pueden  exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales, o a través del proceso de las urnas cada cuatro (4) años.[113]  No obstante, los derechos contenidos en la Carta de Derechos de la Constitución de Puerto Rico, *supra*, le asisten a los individuos frente al Estado.  Esos derechos no pueden extenderse  a las expresiones del Gobierno porque los derechos civiles y políticos están formulados en términos de lo que el Estado no puede hacer con relación a la expresión de los individuos y no a la inversa.  El Gobierno de Puerto

---

[111] P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 381 (1984); Santiago v. Bobb y el Mundo, Inc., 117 D.P.R. 153, 158 (1996).

[112] P.P.D. v. Gobernador I, *supra*;  Noriega v. Gobernador, 130 D.P.R. 919 (1992); Noriega v. Gobernador, 122 D.P.R. 650 (1988); López Vives v. Policía de Puerto Rico, 118 D.P.R. 219 (1987); y Soto v. Srio. de Justicia, 112 D.P.R. 477, 485 (1982).

[113] P.P.D. v. Gobernador I, *supra*; Santiago v. Bobb  y  El Mundo, Inc., *supra*; Soto v. Srio. de Justicia, *supra*.

Rico no tiene un derecho constitucional protegido a la libre expresión.[114]  No obstante, puede contratar los servicios de medios de comunicación propiedad de entidades privadas o de entes corporativos que son instrumentalidades del Estado para la difusión de la política pública formulada.

Al permitir la Ley Núm. 216, *supra,* la autonomía funcional y de la programación de su difusión pública dicho estatuto persigue el funcionamiento armonioso de la democracia constitucional puertorriqueña pues no sólo permite sino que facilita, con la creación de un foro público, que la ciudadanía pueda expresarse libremente y a la misma vez estar adecuada y objetivamente informados de los asuntos comprendidos por la política pública formulada por el Departamento de Educación, **la Universidad de Puerto Rico y el Instituto de Cultura Puertorriqueña** en esas áreas, y a la misma vez esté informada del juicio crítico que sobre la misma pudieran hacer las distintas organizaciones y entidades que tienen interés en dichos temas.  Dicho estatuto le imparte vida al Preámbulo de la Constitución de Puerto Rico en cuanto permite el enriquecimiento de nuestro acervo democrático en el disfrute individual y colectivo del derecho constitucional a la libre expresión, a opinar, a diferir y a influenciar la opinión pública en las áreas mencionadas.  Propicia el diálogo creativo y le imprime vivencia al respeto a los valores básicos de la civilización, particularmente los derechos humanos.  La

---

[114] P.P.D. v. Gobernador I, *supra*.

autonomía concedida a la Corporación tuvo el propósito de brindarle contenido empírico al Preámbulo de la Constitución de Puerto Rico, de lo cual se enriquece y fortalece la democracia.

**La autonomía de la Corporación quedó establecida en el estatuto al disponer que los miembros no *ex officio* de su Junta habrían de ser nombrados por el Gobernador(a) de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico, en forma escalonada, cuyos términos son fijos, y sólo pueden ser destituidos por justa causa.**

El análisis que gobierna el presente asunto no está enmarcado en la definición rígida de categorías de funcionarios adscritos al poder de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico. Está ubicado en la evaluación y determinación judicial sobre si el Poder Legislativo ha intervenido con el ejercicio del **"poder ejecutivo"** del Gobernador(a) de Puerto Rico y de su facultad y deber constitucional de nombramiento y destitución para el alcance de su mandato constitucional de hacer cumplir y de que se ponga en vigor la ley, a tenor con el Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra.* El asunto central ante nos es si el requisito de justa causa para la remoción por el Gobernador(a) de Puerto Rico de los miembros no *ex officio* de la Junta de la Corporación es de tal naturaleza que le impida descargar o desempeñar su rol constitucional.[115]

---

[115] <u>Morrison v. Olson</u>, *supra.*

Concluimos al evaluar la referida cláusula de remoción por justa causa, en conjunto y como un todo con las demás partes de la Ley Núm. 216, *supra*, que dicha limitación al poder de destitución del Gobernador(a) de Puerto Rico no le impide ejercitar su **"poder ejecutivo"** y desempeñar su rol constitucional. Las funciones de los miembros no *ex officio* de la Junta de la Corporación no son **"puramente ejecutivas"**. Dichas funciones no impiden el desempeño del rol constitucional del Gobernador(a) de Puerto Rico. Aunque dichos funcionarios están bajo el poder de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico no tienen función alguna en la formulación de política pública sobre las áreas de educación y cultura o cualquier otra que es esencial y fundamental para el descargo y desempeño de su rol constitucional. Su función es permitir y facilitar la difusión pública de la diversidad de opiniones o visiones sobre esos temas, con independencia del Gobierno de Puerto Rico. Los miembros de la referida Junta de Directores disfrutan, a tenor con el estatuto, de amplia discreción y juicio para decidir cómo descargar y desempeñar sus deberes. No podemos ver cómo y por qué era imprescindible para "la Gobernadora" la necesidad de controlar y dirigir el ejercicio de la discreción de esos funcionarios por ser central y crucial la función que ellos desempeñan para la operación de la función constitucional de la Rama Ejecutiva. No entendemos por qué es necesaria la absoluta discreción del Primer Ejecutivo(a) para destituir esos funcionarios sin

demostrar justa causa. De entender que la Ley Núm. 216, *supra,* no estaba a tono con la filosofía o visión de la entonces administración de gobierno ésta pudo enviar un proyecto de ley a la Legislatura de entonces para derogarla o enmendarla a tenor con su programa de gobierno o visión sobre ese asunto.

Concluimos que la referida cláusula de destitución por justa causa no limita ni restringe en forma impermisible el poder de **"supervisión e inspección"** del Gobernador(a) de Puerto Rico sobre los miembros de la Junta de la Corporación, como funcionarios sujetos a tal poder. La Asamblea Legislativa determinó, como esencial, la limitación al poder de destitución del Gobernador(a) de Puerto Rico, para garantizar expresamente la necesaria independencia de la Corporación del resto del Gobierno, y la autonomía de sus funciones. Concluimos, además, que esa limitación no priva al Gobernador(a) de Puerto Rico de su poder de **"supervisión e inspección"** de los miembros de la Junta. No interfiere en forma impermisible con su facultad y obligación constitucional de hacer cumplir y poner en vigor las leyes. Por el contrario le permite asegurarse que esos funcionarios cumplen a cabalidad con el mandato legislativo impartido por ese estatuto.

No observamos en este caso un intento de la Asamblea Legislativa para aumentar sus poderes a expensas del Poder Ejecutivo. Este caso no presenta una usurpación por el Poder Legislativo de las funciones del Poder Ejecutivo. La

Asamblea Legislativa no retuvo para sí el poder de **"supervisión e inspección"** de los miembros no *ex officio* de la Junta de la Corporación. Concluimos que la referida cláusula de remoción por justa causa no limita en forma impermisible los poderes de la Rama Ejecutiva ni lesiona el balance que debe existir entre las ramas de gobierno.

La cláusula de destitución por justa causa contenida en la Ley 216, *supra,* no constituye un impedimento para que la Rama Ejecutiva pueda descargar y desempeñar las funciones que le fueron asignadas por la Constitución. El Gobernador(a) de Puerto Rico retiene el poder de nombramiento, y el de remoción de los miembros no *ex officio* de la Junta por justa causa, mediando por supuesto en este último la garantía constitucional a un debido proceso de ley, que le provee de una capacidad y habilidad sustancial para asegurarse que ese estatuto sea cumplido y puesto en vigor cabalmente por esos funcionarios. Concluimos que la disposición estatutaria en cuestión no viola el principio de separación de poderes pues el requisito de **"justa causa"** allí prescrito no interviene en forma impermisible con el Poder Ejecutivo ni concentra indebidamente en el Poder Legislativo facultades de esa rama de gobierno.

Es evidente que el principio de autonomía de la Corporación mediante el cambio gradual en la composición de la Junta quedaría eliminado si cada cuatro(4) años una nueva administración desplazara totalmente, sin justa causa, a

sus integrantes para constituir una nueva con personas de su predilección.

Es indispensable en una democracia como la nuestra el mantenimiento de un clima de libre pensamiento y expresión de la ciudadanía, pues de lo contrario se imposibilita la misión de desarrollar individuos libres, según las mejores tradiciones democráticas. El avance del conocimiento mediante la libre confrontación de teorías e ideales, y el brindar orientación y ejemplo a la comunidad en los estilos de tolerancia, respeto e iniciativas de libre discusión es definitivamente un interés apremiante del Estado que emana de la Constitución de Puerto Rico.


V

Concluimos que el requisito de justa causa para la destitución de un miembro no ex officio de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública dispuesto por el Artículo 3 de la Ley Número 216 del 12 de septiembre de 1996, *supra* es válido y no viola el principio de separación de poderes contenido en el Artículo I, Sección 2 de la Constitución de Puerto Rico, *supra* así como tampoco viola el Artículo IV, Sección 4 de ese magno documento.

Así contestamos la interrogante referida por la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, en los términos precisos y específicos que nos fue planteada la cuestión sobre la constitucionalidad del

referido estatuto local impugnado ante ese tribunal, a tenor

con la Constitución de Puerto Rico.


                                        Efraín E. Rivera Pérez
                                           Juez Asociado